IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MICHAEL STEPHEN GALMOR, | § | CASE NO. 18-20209-RLJ-7 |
| | § | |
| Debtor, | § | |
| | § | |
| and | § | |
| | § | |
| GALMOR'S/G&G STEAM SERVICE, INC., | § | CASE NO. 18-20210-RLJ-7 |
| | § | |
| Debtor. | § | |
| | § | |
| KENT RIES, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 20-2003 |
| | § | |
| GALMOR FAMILY LIMITED PARTNERSHIP and GALMOR MANAGEMENT, L.L.C., | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**BRIEF OF LESLIE PRITCHARD: (I) IN OPPOSITION TO TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (II) IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard St., Ste. 3800
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR LESLIE PRITCHARD / DEFENDANTS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I. SUMMARY ................................................................................................1

II. PRITCHARD'S SUMMARY JUDGMENT EVIDENCE ................................................1

III. OBJECTIONS TO TRUSTEE'S SUMMARY JUDGMENT EVIDENCE ......................2

    A. Admission of Evidence ..............................................................6
    B. The Court Cannot Decide Credibility Issues ................................. 6
    C. Debtor's Schedules Are Inadmissible .............................................8
    D. The Invoices Are Inadmissible Hearsay..........................................9
    E. Chart of Alleged Advances Is Inadmissible ............................... 12
    F. Objection to Check Stubs .........................................................14
    G. Evidence of Van Payoff............................................................14

IV. ARGUMENTS AND AUTHORITIES..........................................................15

    A. Summary Judgment Standards ..................................................15
    B. Genuine Issues of Material Fact Preclude
        the Grant of Summary Judgment ............................................ 16
    C. Trustee is Not Entitled to Judgment As a Matter of Law ........................18

        1. No Admissible Evidence of Promise to Pay .................................18
        2. No Claim for Money Had and Received........................................22
        3. No Claim for *Quantum Meruit* ...............................................23

    D. Statute of Limitations Bars Certain Claims ................................25

        1. Breach of Contract/Debt ......................................................25
        2. Unjust Enrichment / Money Had and Received .............................26

    E. Judgment that Collateral Estoppel and *Res Judicata* Do Not Apply.......27

V. CONCLUSION..........................................................................................28

VI. PRAYER ................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986) ......................................................7, 15

*Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ..................................................................6

*Bendlele v. Tri-County Farmer's Co-Op*, 635 S.W.2d 459, 465-66
(Tex. Civ. App. – San Antonio 1982) ............................................................................................19

*Bonn Operating Co. v. Devon Energy Prod. Co.*,
2009 U.S. Dist. LEXIS 146851 at *3 (N.D. Tex. 2009) .................................................................9

*BVS Constr. v. Prosperity Bank (In re BVS Constr., Inc.)*, __ F.4th __,
2021 U.S. App. LEXIS 33822, *9-10 (5th Cir. Nov. 15, 2021) ...................................................28

*Edwards v. Mid-Continent Office Distribs. L.P.*, 252 S.W.3d 833, 837
(Tex. App. – Dallas 2008) ..............................................................................................................23

*Elldge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 870-71 (Tex. 2007) ...............26

*Evans Advertising Agency Inc. v. Morphew*, 525 S.W.2d 56, 59
(Tex. Civ. App. – Tyler 1975) .......................................................................................................19

*Fanco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 608 (Tex. App. – El Paso 2009) .................19

*Guzman v. Allstate Assur. Co.*, 2021 U.S. App. LEXIS 33432 at * 4-*5
(5th Cir. November 10, 2021) .........................................................................................................16

*Heldenfels Bros. Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) ....................................23

*In re Cobrans Corp.*, 2001 U.S. App. LEXIS 30998 at *2 (5th Cir. 2001) ......................................9

*In re Powell*, 88 B.R. 114, 117 (Bankr. W.D. Tex. 1988) ...............................................................8

*In re Presta*, 2014 Bankr. LEXIS 2380 *6 (Bankr. M.D. Fla. 2014 ...............................................8

*Lanier v. Eastern Founds. Inc.*, 401 S.W.3d 445, 459 (Tex. App. – Dallas 2013, no pet.).....18, 19

*Merry Homes Inc. v. Luc Dao*, 359 S.W.3d 881, 884 (Tex. App.—Houston 2012, no pet.) ........26

*Midwestern Cattle Mktg. LLC v. Legend Bank N.A.*, 800 Fed. App. 239, 246 (5th Cir. 2020).....23

*Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005).............................................28

*Payne v. Wells Fargo Bank N.A.*, 2015 U.S. Dist. LEXIS 39325 at *13-*14 (N.D. Tex. 2015)...26

*Pepi Corp. v. Galliford*, 254 S.W.3d 457, 461 (Tex. App. – Houston [1st Dist.] 2007) ...............25

*Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004) ......................................28

*Sandstad v. CB Richard Ellis*, 309 F.3d 893, 896 (5th Cir. 2002) ..................................................7

*Stefek v. Helvey*, 601 S.W. 2d 168, 171 (Tex. Civ. App. – Corpus Christi 1980) ........................19

*Travelers Lloyds Ins. Co. v. All-Glass Aquarium Co.*,
2014 U.S. Dist. LEXIS 7228 at *13 (N.D. Tex. 2014) ...................................................................9

*United States v. Box*, 50 F.3d 345, 355 (5th Cir. 1995) ..................................................................9

*United States v. Durrett*, 524 Fed. Appx. 492, 496-97 (11th Cir. 2013) ......................................12

*United States v. Towns*, 718 F.3d 404, 410 (5th Cir. 2013) ..........................................................12

## Statutes and Rules

11 U.S.C. § 108(a)(2) .....................................................................................................................25

Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(3) ....................................................................25

Tex. Prop. Code Ann. § 113.151 .................................................................................................17

Tex. Prop. Code Ann. § 113.152 .................................................................................................17

Fed. R. Civ. P. 56(a) .....................................................................................................................15

F.R.E. 803(6) .................................................................................................................................10

Fed. R. Evid. 1006 ........................................................................................................................13

**BRIEF OF LESLIE PRITCHARD: (I) IN OPPOSITION TO TRUSTEE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
(II) IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE ROBERT JONES, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, Leslie Pritchard ("Pritchard"), court-appointed liquidator for Galmor Family Limited Partnership (the "FLP"), a defendant in the above styled and numbered Adversary Proceeding, and files this her *Brief of Leslie Pritchard: (i) In Opposition to Trustee's Motion for Partial Summary Judgment; and (ii) In Support of Cross Motion for Partial Summary Judgment* (the "Brief"), opposing the *Plaintiff's Motion for Partial Summary Judgment* (the "Motion") and in support of the *Cross-Motion of Leslie Pritchard for Partial Summary Judgment* (the "Cross Motion"), respectfully stating as follows:

## I.    SUMMARY

1.       The Trustee seeks summary judgment that $1,096,051.32 (the "Alleged Debt") is allegedly owed by the FLP to Galmor's/G&G Steam Service, Inc. (the "Debtor"). The Alleged Debt is disputed. There is no underlying note or contract. Yet, the Trustee submits that there is no genuine issue of material fact because Michael Stephen Galmor ("Mr. Galmor") *says* the Alleged Debt exists, because of inadmissible invoices supporting the Alleged Debt, and because of other inadmissible and contested evidence. In the end, the most important thing that will matter is Mr. Galmor's credibility. He has none. Even so, it is axiomatic that the Court cannot decide credibility issues on summary judgment. And, Pritchard's evidence demonstrates a wealth of genuinely disputed material facts.

2.       For example, if the Invoices (defined below) are real, why are they not shown as owing in the Debtor's QuickBooks files? If the Alleged Debt is real, why did Mr. Galmor not disclose it pursuant to a statutorily mandated accounting of the FLP? If the Debtor believes that the Alleged Debt is valid, why is it not listed on the Debtor's balance sheet? And, if the FLP ever

agreed to be liable for any of the Alleged Debt, why is the Alleged Debt not included in its financials or on its tax returns? Mr. Galmor, who is the only person to say that the Alleged Debt is real, is also the person responsible for each of these critical "omissions." How the Trustee can possibly explain away these facts at trial will be seen, but at the summary judgment stage, these facts are fatal to the Motion—even setting aside the inadmissibility of the Trustee's own summary judgment evidence.

3.       The Court should therefore deny the Motion; first, because the Trustee has failed to present evidence on the elements of his claims; second, because the Trustee has offered evidence that is inadmissible; third, because Pritchard's summary judgment evidence demonstrates the existence of multiple disputed issues of material fact; and fourth, because some of the Trustee's claims are barred by the statute of limitations. The Court should also grant the Cross-Motion with respect to the limited relief requested therein related to some of the Alleged Debt on limitations issues and some of the Trustee's claims on substantive law.

## II.       PRITCHARD' SUMMARY JUDGMENT EVIDENCE

4.       Much of the Trustee's evidence in support of the Alleged Debt involves the Invoices (defined below) and the Alleged Advances (defined below). Pritchard sets forth below her objections to the Trustee's summary judgment evidence. Additionally, Pritchard offers the following evidence in opposition to the Motion.[1]

5.       First, Pritchard offers the opinion of her expert, Maison Vasek ("Vasek"), and the transcript of the Trustee's deposition of Vasek. *See* PAPP 1-55 (expert report) & PAPP 21-55 (expert deposition). Regarding Vasek's qualifications, he is a licensed CPA; he worked for KPMG, LLP for three years in its audit department and then for five years for Whitley Penn, LLP

---

[1]       Pritchard's Appendix in opposition to the Motion is cited to herein as "PAPP ___."

in its audit department; he served in the private sector as a Chief Financial Officer for four years; and, most recently, he is a founding partner in the accounting firm of Bodwell Vasek Wells DeSimone LLP. *See* PAPP 4 & PAPP 6-8. He has extensive experience working for various companies as an auditor, and he has taken courses in forensic accounting and has issued forensic accounting reports. *See id* & PAPP 24 (13:2-11). He is an expert on, among other things, QuickBooks. *See* PAPP 8. As part of his engagement, he reviewed all available books and records of, among other companies, the Debtor, including is QuickBooks files. *See* PAPP 8-12.

6.     With respect to the Invoices totaling $384,904.74, these Invoices are not recorded in the Debtor's QuickBooks files as being due by the FLP:

> Q. So what are you saying? I mean, are you saying these invoices are due or not due?
>
> A. We don't have enough information to say if they are due or not. You know, according to the most recent QuickBooks file, nothing is due, so that's all I can go off of. For example, this is from 2014. You know, a lot -- a lot happened between them and the latest file. And in the latest file, it shows that none of these are due.
>
> Q. When you say none of them are due, what are – don't understand what that means.
>
> A. So, you know, you bill an invoice in 2014. It could get paid or written off subsequent to that. So between 2014 and, you know, the balances I was provided, you know, from that computer in your office, it didn't have -- The most current QuickBooks file that we were provided by you is that it shows that there are no open invoices, you know, sitting in Galmor's/G&G's books.
>
> Q. And are you saying that they were not shown as assets, like a receivable?
>
> A. Correct.

PAPP 36 (62:18-63:17).

7.     Thus, as Vasek confirmed, the very Invoices that the Trustee relies on (themselves inadmissible) are not recorded on the Debtor's QuickBooks files as due or even as receivables or asset at all.

8. Similarly, with respect to the Alleged Advances, Vasek confirmed that "there was no record of any kind on the FLP's books regarding the royalty payments." *See* PAPP 42 (87:10-15). He also confirmed that, "[i]n the G&G Current QB File, there is no record, booking, or entry related to royalty advances due from the FLP." *See* PAPP 17. And Vasek confirmed that, while the Debtor was paying the FLP a royalty of 75 cents per ton for rock removed from the FLP's quarry, very shortly after his father died and Mr. Galmor obtained control of the FLP, that amount dropped to 50 cents per ton, even though the Debtor was paying other quarries it extracted rock from between $1 and $2 per ton. *See* PAPP 42-44 (92:6-94:25); PAPP 19. Even as Mr. Galmor dropped the price paid to the FLP from 75 cents per ton to 50 cents per ton, the amounts paid to other quarries remained the same. *See id*. Had the Debtor continued paying the FLP at the 75-cent rate after his father died, the Debtor would have owed the FLP an additional $400,623.13 in royalties. *See* PAPP 19.

9. Second, Pritchard offers the deposition of Dana Carter ("<u>Ms. Carter</u>"). *See* PAPP 1119-1290. Ms. Carter was the bookkeeper for, among other businesses owned by Mr. Galmor, the Debtor. *See* PAPP 1135 (17:16-18). During prepetition litigation between Ms. Pritchard and Mr. Galmor, Pritchard's attorneys demanded certain information from Mr. Galmor with respect to the finances of the FLP. *See* PAPP 1292 at ¶¶ 4-7. During the course of that litigation, Mr. Galmor provided certain information to Ms. Pritchard, in the nature of an accounting pursuant to a Texas statute of the FLP's assets and liabilities (the "<u>Accounting</u>"). *See id*. Ms. Carter helped prepare that Accounting. *See* PAPP 1206 (88:16-22). As part of that Accounting, she prepared the tab labeled "liabilities." *Id*. She provided that tab to Mr. Galmor. *See* PAPP 1207 (89:7-9).

10. The Accounting had a whole tab of the FLP's "Liabilities." *See* PAPP 977-981. The Alleged Debt is nowhere listed with respect to long term or note debt. *See id*. The Alleged Debt is nowhere listed under "Recurring Monthly Liabilities." *See id*. The Alleged Debt is

nowhere listed under "Other Liabilities." *See* PAPP 980. In fact, the Alleged Debt, and no part of it, is listed anywhere in the Accounting.

11.    Third, Pritchard offers the deposition of Mr. Galmor, and the exhibits attached thereto. *See* PAPP 56-1118. These exhibits include the tax returns of the FLP, prepared by an outside accountant under the direction of Mr. Galmor and with information provided by, in part, Ms. Carter. *See* PAPP 128-29 (73:23-74:8). The FLP's 2017 tax return (PAPP 423-469) contains a form for the FLP's balance sheet, and includes entries for "accounts payable," for "notes," for "loans from partners (or person related to partners)," and for "other liabilities." *See* PAPP 437. Nowhere here is the Alleged Debt listed. *See id*. The same is true of the FLP's 2016 tax return. *See* PAPP 546-584 & PAPP 559.

12.    Fourth, Pritchard offers the Debtor's financial records, through November, 2018. *See* PAPP 627-630. The balance sheet does not list the Alleged Debt as an asset, although it lists $414,821.61 of unspecified accounts receivable. *See* PAPP 630. Even the entry for "Other Current Assets" does not list the Alleged Debt. *See id*. This is doubly of interest because, while the immediately pre-bankruptcy balance sheet of the Debtor shows no entry as an asset or otherwise for the Alleged Advances, 575, the Debtor's balance sheet as of the end of December, 2017 (PAPP 636-641) shows $284,733.42 for "Royalty Advance." *See* PAPP 636. Arguably, the 2017 "Royalty Advance" refers to the Alleged Advances, although it is not clear to whom the advances were made. But the fact that those do not appear on the 2018 balance sheet suggests that, at some point, these were repaid. As Vasek testified, the Alleged Advances were repaid because the Debtor continued to extract rocks from the FLP's quarry. *See* PAPP 42 (85:3-24).

13.    Fifth, Prichard offers prior printouts of the FLP's QuickBooks file. Of importance, the FLP's QuickBooks file is missing—and it's the only one that is missing—even though both Mr. Galmor and Ms. Carter testified that it was on a server provided to the Trustee. Pritchard's

experts reviewed that server and confirmed that there is no FLP QuickBooks file on it, which is a serious issue. *See* PAPP 15-16. However, Pritchard does have prior FLP QuickBooks reports that were printed during the course of non-bankruptcy litigation. *See* PAPP 1292 at ¶¶ 4-6. Those reports include the FLP's balance sheet, which does not list the Alleged Debt or any portion of it anywhere as a liability. *See* PAPP 645-647. At most, there are $319,733.20 in unidentified "Accounts Payable." *See* PAP 645.

### III.   OBJECTIONS TO TRUSTEE'S SUMMARY JUDGMENT EVIDENCE

#### A.   ADMISSION OF EVIDENCE

14.     It should go without saying that, in order to be admissible on summary judgment, evidence must be admissible the same as it would be at trial. *See, e.g., Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). Here, the Trustee offers the following evidence in support of the Motion: (i) the Debtor's schedules as filed in its Bankruptcy Case; (ii) the *Affidavit of Michael Stephen Galmor* (the "Galmor Affidavit"), executed by the Debtor's co-debtor, Mr. Galmor; and (iii) the *Affidavit of Matt Brooks* (the "Brooks Affidavit"), executed by Matt Brooks ("Mr. Brooks").

15.     By the same, the Trustee offers alleged invoices from the Debtor to the FLP (the "Invoices") totaling $374,708.81, as evidence for a portion of the Alleged Debt; and (ii) a spreadsheet purportedly created by Mr. Brooks as evidence of an advance of $186,341.19 allegedly by the Debtor to the FLP for future rock quarry advances (the "Alleged Advances"), as evidence for a portion of the Alleged Debt. Pritchard objects to all of this evidence.

#### B.   THE COURT CANNOT DECIDE CREDIBILITY ISSUES

16.     It is elemental that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256

(1986). In considering summary judgment, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Sandstad v. CB Richard Ellis*, 309 F.3d 893, 896 (5th Cir. 2002). Moreover, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

17.    Here, the Trustee's summary judgment evidence depends on the credibility of Mr. Galmor. Mr. Galmor testifies that he "used Galmor's/G&G Steam Service, Inc. funds to support the Galmor Family Limited Partnership." Galmor Affidavit at p. 3. He further testifies that:

> This included Galmor's/G&G Steam Service, Inc. directly paying expenses and salaries that were properly allocated to the Galmor Family Limited Partnership. I directed Galmor's/G&G Steam Service, Inc. employees to run the operations of the Galmor Family Limited Partnership and to care for my mother. Further, Galmor's/G&G Steam Service, Inc. directly advanced funds to the Galmor Family Limited Partnership when it ran out of cash to pay its bills. . .
>
> I continued to financially support the Galmor Family Limited Partnership through Galmor's/G&G Steam Service, Inc., with the expectation that the Galmor Family Limited Partnership would repay this debt, even if that repayment meant eventually liquidating some of the Galmor Family Limited Partnership's real estate holdings. Liquidating the Galmor Family Limited Partnership real estate was considered by me to be the method of last resort to fund its operations and for the repayment of its debt. Galmor's/G&G Steam Service, Inc. kept records of all the funds, salaries, expenses and other debts incurred by the Galmor Family Limited Partnership so that a proper accounting could be made of its debt owed to Galmor's/G&G Steam Service, Inc.

*Id*. at p. 3.

18.    The Court cannot accept the foregoing as conclusive or even persuasive, as there is no underlying contract or promissory note, without making a credibility determination regarding Mr. Galmor, which the Court may not do on summary judgment. And, there is ample evidence that Mr. Galmor's testimony is not credible based on solid *documentary* evidence offered by Pritchard.

19.    Nor can the Court accept Mr. Brook's testimony regarding the Alleged Invoices and the Alleged Advances without making a credibility determination, since Mr. Galmor testifies

that "I was the person responsible for the supervision of Matt Brooks.  This supervision included instructing him to invoice the Galmor Family Limited Partnership for expenses incurred by Galmor's/G&G Steam Service, Inc. for the benefit of, and properly allocated to, the Galmor Family Limited Partnership."  Galmor Affidavit at p. 2.  Thus, Mr. Brooks' credibility is tainted by Mr. Galmor's lack of credibility since Mr. Galmor "instructed" Mr. Brooks to prepare the invoices, presumably with information provided by Mr. Galmor.  Nowhere does Mr. Brooks testify about the Alleged Debt on personal knowledge, instead testifying that he was "responsible for invoicing these expenses . . . at the direction of Stephen Michael Galmor."  Brooks Affidavit at p. 2.  And, as with Mr. Galmor, the documentary evidence offered by Pritchard raises into doubt the credibility of Mr. Brooks, or at least his work product.

## C.    DEBTOR'S SCHEDULES ARE INADMISSIBLE

20.    The Trustee makes the argument that, because the Debtor scheduled the Alleged Debt, this is evidence that the Alleged Debt is valid.  This argument has no more merit than a debtor who does not schedule a claim and then argues that a claim should be disallowed because the omission of being scheduled means that the debt does not exist.  Schedules can be used *against* a debtor (as admissions or for section 523 or 727 purposes, for example), but using them as positive evidence in a dispute is an entirely different matter.

21.    More to the point, however, the schedules are hearsay because the Trustee offers them for the truth of the matters asserted; *i.e.* that the Alleged Debt exists, even though schedules may be admissible for defensive or other purposes.[2]  *See, e.g., In re Powell*, 88 B.R. 114, 117 (Bankr. W.D. Tex. 1988) ("[t]he schedules, of course, are self-serving hearsay in the first event").  *See also In re Presta*, 2014 Bankr. LEXIS 2380 *6 (Bankr. M.D. Fla. 2014 ("[c]onsistent with the

---

[2]        For example, schedules may be admissible against a debtor as the admissions of a party opponent.

hearsay rule, statements contained in bankruptcy schedules are inadmissible"). And, as with the inappropriateness of the Court considering Mr. Galmor's credibility on summary judgment, the same applies to the schedules: the Court cannot consider the Debtor's schedules as evidence of the Alleged Debt without considering, and weighing, the credibility of the person who executed those schedules, Mr. Galmor.

22.     Accordingly, Pritchard objects to the admission of the Debtor's schedules as evidence of the Alleged Debt.

## D.     THE INVOICES ARE INADMISSIBLE HEARSAY

23.     The Invoices are hearsay because the Trustee offers them to prove the truth of the matter asserted; *i.e.* the fact and amount of the Alleged Debt. *See In re Cobrans Corp.*, 2001 U.S. App. LEXIS 30998 at *2 (5th Cir. 2001) ("the bankruptcy court abused its discretion in admitting certain invoices that were inadmissible hearsay"); *United States v. Box*, 50 F.3d 345, 355 (5th Cir. 1995) ("written documents introduced for the truth of the statements contained therein are generally inadmissible as hearsay"); *Travelers Lloyds Ins. Co. v. All-Glass Aquarium Co.*, 2014 U.S. Dist. LEXIS 7228 at *13 (N.D. Tex. 2014) ("the ACR printout and invoices and Lacava's affidavit statements regarding the contents of the ACR and missing and retained invoices are hearsay"); *Bonn Operating Co. v. Devon Energy Prod. Co.*, 2009 U.S. Dist. LEXIS 146851 at *3 (N.D. Tex. 2009) ("when used to prove their contents, documents such as bills, invoices, and receipts are hearsay").

24.     An exception applies under Rule 803(6) for the records of a regularly conducted activity. The Rule excludes from the rule against hearsay "[a] record of an act, event, condition, opinion, or diagnosis if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

F.R.E. 803(6).

25.     This exception is not satisfied because the Trustee has failed to satisfy requirement (A) with respect to being made "at or near the time."  Furthermore, the source of information and the method or circumstances of preparation indicate a lack of trustworthiness, for the reasons discussed below and given the fact that the Invoices are not even in the Debtor's QuickBook file.

26.     Mr. Brooks attempts, through conclusory statements, to evidence that the Invoices were made "at or near the time," as he states that the "transactions [were] recorded to compile the invoices at or near the time stated on the invoices."  Brook Affidavit at p. 2.  This is demonstrably false for many of the Invoices.  Invoice No. 127966, dated 9/30/2016, for example, covers alleged wages and benefits monthly for November, 2015 through July, 2016.  *See* SG_016900-03.  Invoice No. 125112, dated 10/31/2015, covers alleged wages and benefits monthly for February, 2015 through October, 2015.  *See* SG_016904-10.  Invoice No. 120423, dated June 30, 2014, covers wages and benefits between January, 2014 and June, 2014.  *See* SG_016911.  Clearly these Invoices were created after-the-fact to cover months—up to eleven (11) months—worth of alleged services.  These Invoices may have been created "at or near the time stated on the invoices" as Mr. Brooks states, but that is all the more damaging because the Rule requires that the *record*, the actual entry of the service or expense, be "made" at or near the time.

27.     That the Invoices were created after-the-fact, perhaps precisely to try to "paper" the Alleged Debt in light of litigation (remembering that the Invoices were produced in some prior litigation as evidenced by their Bates-numbering) is further evidenced by the following. Invoice No. 121125, dated 7/31/2014, is for the wages and benefits of several people for "July 2014." SG_016912. But so is invoice no. 121994, dated 8/31/ 2014, for the same people for "July 2014." SG_016913. And so is invoice 122454, dated 9/30/2014—same people, same "July 2014." SG_016914. Only with invoice no. 123004, dated 10/31/2014, does the month of the wages and benefits advance to "October 2014." SG_016915. What happened is obvious: someone was creating the records and the invoices, after-the-fact, and mistakenly created three entries for July, 2014, instead of July, August, and September.

28.     And, the Invoices are bates-labeled as having been produced in prior litigation. While the Trustee produced the Invoices in this litigation, he actually obtained them from this prior litigation. *See* PAPP 1294 at ¶ 8 & PAPP 1299. The Invoices were actually produced by Mr. Galmor in 2017 and 2018. *See* PAPP 1299. That is doubly suspicious on multiple counts, including the timing of the records, whether they were ordinarily kept (or were made or kept for litigation purposes), and whether they are trustworthy. Why, for example, did the Trustee simply not print fresh invoices from the QuickBooks file? Perhaps the Invoices were valid in 2017 and 2018, but were written off, repaid, or otherwise disposed of, which may explain why they are not reflected in the Debtor's current QuickBooks file. Mr. Brooks states that these Invoices remained unpaid at the time he left the Debtor's employment in June, 2018, but what about afterwards? *See* Brooks Affidavit at pp. 1-2.

29.     In light of these obvious facts, Mr. Brooks' confusing statement that "transactions [were] recorded to compile the invoices at or near the time stated on the invoices" can be understood. Brook Affidavit at p. 2. Mr. Brooks is not saying that the actual entries and records

that rolled up into the Invoices were made "at or near" the time of the service or even the invoice, only that the invoices were created "at or near" the time that the Invoices are dated. That makes the Invoices inadmissible under the hearsay exception because it must be the actual record, *i.e.* that x provided services in month y, that is made "at or near" the time of the services. It is the "transaction" itself that must be recorded "at or near" the time that the "transaction" occurs for the hearsay exception to apply. *See United States v. Durrett*, 524 Fed. Appx. 492, 496-97 (11th Cir. 2013).

30.     The key to the hearsay exception is that "the records are free from adulteration after the fact." *United States v. Towns*, 718 F.3d 404, 410 (5th Cir. 2013). Yet that is what strongly appears to have happened here, especially when one considers that the Invoices were produced during litigation where Mr. Galmor was trying to defend himself against claims of malfeasance. That is why the record itself must be made "at or near" the time. *See id*. Here, there is no evidence that the underlying records were made at or the near the time of the event they purport to memorialize; only that the Invoices were made at or near the time stated on them. Those are two very different things, and the fact that the Invoices were made after-the-fact—not to mention that they are not even listed in the Debtor's QuickBook files, from where there were purportedly drawn—means that they are of questionable authenticity and that they are inadmissible as hearsay.

31.     Accordingly, Pritchard objects to the admission of the Invoices.

## E.      CHART OF ALLEGED ADVANCES IS INADMISSIBLE

32.     Mr. Brooks' affidavit contains, as Exhibit "B," a chart purporting to evidence the Alleged Advances. However, Mr. Brooks states that this is a "copy of a spreadsheet I prepared to summarize advances of funds [the FLP] received." Brooks Affidavit at p. 3.

33.     Pritchard objects to this exhibit and this testimony because Mr. Brooks has not been shown to have any personal knowledge regarding the Alleged Advances. At most, he has

knowledge of the Debtor's QuickBooks files, but he cannot testify that the underlying transfers occurred, or why they occurred, or that they were advances. Thus there is a lack of foundation for him to testify that any amount is owing by the FLP to the Debtor for alleged royalty advances. *See* Brooks Affidavit at p. 4. The chart is also hearsay because it is apparently made from records which themselves are not attached but which would be hearsay for the same reasons as the Invoices, without the hearsay exception being satisfied.

34.     The Trustee further objects to this exhibit and this testimony under Rule 1006, labeled "Summaries to Prove Content," which provides that:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

FED. R. EVID. 1006.

35.     Mr. Brooks does not explain from where he obtained the records to create his summary, and the underlying records are not otherwise offered into evidence. Mr. Brooks has not made the underlying records available to the FLP, especially as he fails to explain what they are and where they are. Mr. Brooks states that the chart was made from records of advances, *see* Brooks Affidavit at p. 3, so the records presumably exist, but have not been included. And, as with the Invoices, the chart is bates-labeled and was also produced years ago in prepetition litigation which, for the same reasons as the Invoices, makes them highly suspect and not proper business records.

36.     Accordingly, Pritchard objects to the spreadsheet and Mr. Brooks' purported testimony regarding the Alleged Advances.

F.   **OBJECTION TO CHECK STUBS**

37.   Mr. Brooks also attaches various check stubs purporting to be "check subs of each advance of funds." Brooks Affidavit at p. 3. Pritchard objects to this testimony and to the check stubs. First, a check stub is not probative of anything: it does not mean that the check was delivered or cashed. Second, the check stubs do not even reflect that the check were drawn on the Debtor's account. Third, under the best evidence rule, the best evidence of a payment by check is a copy of the negotiated check or a copy of a bank statement showing that the check was negotiated, neither of which are included. And. Mr. Brooks offers no personal knowledge or testimony that any checks attached to the stubs were delivered to the FLP or negotiated by the FLP. Fourth, any statements on the check stubs are hearsay.

38.   Accordingly, Pritchard objects to the admission of the check stubs.

G.   **EVIDENCE OF VAN PAYOFF**

39.   Perhaps most remarkably, the Trustee seeks summary judgment that $24,807.39 was advanced by the Debtor to the FLP to "pay off a handicap van for [Mr. Galmor's] mother that was financed at First State Bank." Galmor Affidavit Exhibit A at p. 6. Mr. Galmor opines:

> Galmor's/G&G Steam Service, Inc. paid off the debt on a 2014 Dodge van that had been purchased by my mother to transport her with handicapped accessible equipment. The amount paid on May 19, 2017 was $24,807.39. This debt should have been paid by the Galmor Family Limited Partnership, but it had insufficient funds to do so.

Galmor Affidavit at p. 4.

40.   Any evidence of this alleged debt for the van is inadmissible and irrelevant. As noted above, the Court cannot weigh Mr. Galmor's credibility at this stage. Second, Mr. Galmor's testimony that this allege debt "should have" been paid by the FLP is opinion testimony that he has not been shown to be qualified to offer. Third, this opinion testimony is a legal conclusion that no witness can offer. Fourth, nowhere does the Trustee offer to explain how and why the FLP

should have been responsible to pay the debt on this van: no offer of any agreement, no offer of any nexus as to why this was the FLP's obligation, and, indeed, no evidence that the FLP ever agreed to pay this debt for whatever reason, much less any consideration that the FLP would have received for the payment.

41.     Indeed, Mr. Galmor's evidence is that this van was titled in the name of "Shirley Galmor." Galmor Affidavit at Exhibit B. Any debt on the van was the debt of "Shirley Galmor." *Id*. As the van was not owned by the FLP and the loan was not the responsibility of the FLP, there is no reason in fact, logic, or law why the FLP could be responsible for the payoff. And the Trustee's own evidence is contradictory: whereas the Trustee and Mr. Galmor suggest that the Debtor made the payoff, the check stub (inadmissible as it is) shows that "Steve Galmor" made the payment; not the Debtor. *See* Galmor Affidavit at last page (M.GALMOR_2310).

## IV.     ARGUMENTS AND AUTHORITIES

### A.     SUMMARY JUDGMENT STANDARDS

42.     As the movant on summary judgment, the Trustee bears the burden of proving that there is no genuine issue of material fact, including the burdens of production and persuasion in demonstrating that they entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). And as the Supreme Court has made clear regarding summary judgment evidence, "all justifiable inferences are to be drawn in his [nonmovant's] favor." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). The Fifth Circuit has very recently reaffirmed the high burden that the Trustee carries:

> we view the evidence in the light most favorable to the nonmovant and construe all reasonable inferences in her favor. Summary judgment is only appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. When the movant also carries the burden of proof at trial . . . his burden is even higher; he must establish beyond peradventure all of the essential elements of the claim or defense. Only if the movant succeeds must the nonmovant designate specific facts showing that there is

a genuine issue for trial.  Finally, courts may not evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes.

*Guzman v. Allstate Assur. Co.*, 2021 U.S. App. LEXIS 33432 at * 4-*5 (5th Cir. November 10, 2021) (internal citations and quotations omitted).

43.  Here, as explained above, the Trustee's evidence is inadmissible.  The Trustee has not "establish[ed] beyond peradventure all of the essential elements of the claim."  Even if the Trustee has offered admissible evidence in support of each element of his claims, however, that evidence is subject to genuine and material dispute.  The Court should therefore deny the Trustee's Motion.

44.  Conversely, the Court should grant the Cross-Motion by finding that certain of the Invoices and the Alleged Advances are barred by limitations and other issues as a matter of law, as discussed below.  The relevant Invoices do not have to be admissible for the Court to make this determination; rather, the question is, if these Invoices were admissible and if they were evidence of an underlying debt, they would still be barred.

## B.  GENUINE ISSUES OF MATERIAL FACT PRECLUDE THE GRANT OF SUMMARY JUDGMENT

45.  Assuming that the Trustee's evidence of the Alleged Debt is admissible, the question is whether that evidence is subject to material dispute.  It most certainly is.  Pritchard's proposition in this respect is straight-forward: if a lender was owed money, then one would think that the lender would record the loans on his books and records, and if a borrower owed money, then one would think that the borrower would likewise record the debt on his books and records, and report the debt on his tax return.  And, most importantly, when the same person is in charge of both the lender and the borrower and is charged by Texas statute with providing an accounting, one would expect that the accounting would include the debt.  Here, none of this is true.

46.     First, as noted above, the Invoices are not reflected on the Debtor's QuickBooks files as assets, receivables, or amounts owing.  That is the best evidence that the Invoices do not represent a presently existing obligation or, at a minimum, are subject to genuine dispute.  This is all the more so when the Court considers that the Invoices have not been freshly printed or pulled off the QuickBooks file, but were printed and produced years ago in then-active litigation concerning Mr. Galmor's alleged malfeasance.  The same is true for the Alleged Advances.

47.     Second, as also noted above, and critically, the Accounting prepared by Mr. Galmor, then in charge of the FLP and the Debtor, and the person claiming that the Alleged Debt is legitimate, does not list the Alleged Debt or any portion of it.  The first page of the Accounting, a cover e-mail from Mr. Galmor's attorney to Ms. Carter, reveals that the Accounting was prepared and provided pursuant to section 113.152 of the Texas Property Code, applicable to trusts (Mr. Galmor being the trustee of the trusts which owned the FLP, in addition to having managed the FLP).  The Property Code provides for a "Demand for Accounting," and requires as follows: "A beneficiary by written demand may request the trustee to deliver to each beneficiary of the trust a written statement of accounts covering all transactions since the last accounting or since the creation of the trust, whichever is later."  TEX. PROP. CODE ANN. § 113.151.  This is what Pritchard demanded.  The statutorily mandated accounting then requires, among other things, a listing of all liabilities.  *See id.* at § 113.152.  This Accounting, prepared pursuant to Texas statute, and at a time *after* Mr. Galmor executed the Debtor's schedules, does not list the Alleged Debt. This is strong evidence that the Alleged Debt did not exist and was not recognized as debt by the FLP or agreed to be repaid by the FLP.

48.     Third, as also noted above, the Debtor's financial records, including its balance sheet, do not list or record the Alleged Debt.  This is also true of the FLP's financial records and its balance sheet.  That both the lender and borrower did not carry the debt on their balance sheets—

debt of over $1 million at that—is strong evidence that the Alleged Debt did not exist and, at a minimum, that the FLP never agreed to repay the Alleged Debt.

49.     Fourth, as also noted above, the FLP's tax returns, prepared under the supervision of Mr. Galmor, which expressly require the FLP to list debt owed to partners and to related entities of partners, fails to disclose the Alleged Debt. Again, this is strong evidence that the Alleged Debt never existed (Mr. Galmor is unlikely to forget a debt of over $1 million) and, at a minimum, that the FLP never agreed to repay the Alleged Debt.

50.     Accordingly, even if the Trustee has offered admissible evidence as to the existence and validity of the Alleged Debt, Pritchard's summary judgment evidence—most of which originates with the same Mr. Galmor who now purports to swear that the Alleged Debt exists—demonstrates, at a minimum, that there is a genuine issue of material fact with respect to this ultimate issue.

## C.     TRUSTEE IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW

### 1.     No Admissible Evidence of Promise to Pay

51.     The crux of the Trustee's argument is that the FLP agreed to pay the Debtor for the Alleged Debt, including the Invoices and Alleged Advances. As the Trustee correctly cites, the claim for the Alleged Debt is premised on an oral contract which, like any other contract, "a party must prove, among other elements, an offer and acceptance and a meeting of the minds on all essential elements." *Lanier v. Eastern Founds. Inc.*, 401 S.W.3d 445, 459 (Tex. App. – Dallas 2013, no pet.). Further:

> The term 'meeting of the minds' refers to the parties' mutual understanding and assent to the expression of their agreement. To create an enforceable contract, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms. The parties must agree to the same thing, in the same sense, at the same time.

*Id*. Stated differently, the elements under Texas law for the formation of a contract, whether written or oral, are the following:

> (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding.

*Fanco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 608 (Tex. App. – El Paso 2009). Importantly, "[t]he parties' subjective thoughts and beliefs do not control. When the 'meeting of the minds' element is contested, it is a question for the fact finder." *Id*. (internal citation omitted).

52. Here, the Trustee has offered no evidence, admissible or otherwise, that the FLP agreed to pay any of the Alleged Debt or that there was a meeting of the minds on this issue— which latter question is itself a question of fact that cannot be adjudicated on summary judgment.

53. First, with respect to the Invoices, the Invoices are not evidence of a promise to pay. An invoice cannot be used to prove the *existence* of a debt. A lawyer may send someone an invoice. But, if the person has not agreed to hire the lawyer and has not agreed to be liable for fees, then the invoice is evidence of nothing. What is missing is a promise to pay. *See, e.g., Evans Advertising Agency Inc. v. Morphew*, 525 S.W.2d 56, 59 (Tex. Civ. App. – Tyler 1975) ("[i]nvoices or statements from plaintiff, copies of which are attached to its pleading, are not sufficient to show that personal services were rendered to defendant"). *See also Stefek v. Helvey*, 601 S.W. 2d 168, 171 (Tex. Civ. App. – Corpus Christi 1980) (holding that an invoice is not evidence of debt unless there is "an expression of a willingness to pay"). Invoices can be considered as evidence of a debt only when there is other evidence of an agreement to pay. For example, where an invoice is signed by the party sought to be charged with its payment, that is evidence of an agreement to pay. *See Bendlele v. Tri-County Farmer's Co-Op*, 635 S.W.2d 459, 465-66 (Tex. Civ. App. – San Antonio 1982). Here, however, the Invoices are not signed, and the Trustee presents no evidence of any agreement by the FLP to pay the Invoices (much less the Alleged Advances).

54.     Second, the Trustee does not otherwise offer any evidence of the FLP's agreement to pay the Alleged Debt.  The Galmor Affidavit discusses the Alleged Debt, but nowhere does Mr. Galmor, on behalf of the FLP, offer any testimony that the FLP agreed to pay the Alleged Debt. Mr. Galmor testifies that he served as the manager of the FLP from April 3, 2013 to August, 2019. Galmor Affidavit at p. 2.  Mr. Galmor claims as follows:

> I used Galmor's/G&G Steam Service, Inc. funds to support the Galmor Family Limited Partnership.  This included Galmor's/G&G Steam Service, Inc. directly paying expenses and salaries that were properly allocated to the Galmor Family Limited Partnership. I directed Galmor's/G&G Steam Service, Inc. employees to run the operations of the Galmor Family Limited Partnership and to care for my mother.  Further, Galmor's/G&G Steam Service, Inc. directly advanced funds to the Galmor Family Limited Partnership when it ran out of cash to pay its bills.

*Id*. at p. 3.  The closet that Mr. Galmor comes is as follows:

> I continued to financially support the Galmor Family Limited Partnership through Galmor's/G&G Steam Service, Inc., <u>with the expectation</u> that the Galmor Family Limited Partnership would repay this debt, even if that repayment meant eventually liquidating some of the Galmor Family Limited Partnership's real estate holdings. Liquidating the Galmor Family Limited Partnership real estate was considered by me to be the method of last resort to fund its operations and for the repayment of its debt. Galmor's/G&G Steam Service, Inc. kept records of all the funds, salaries, expenses and other debts incurred by the Galmor Family Limited Partnership so that a proper accounting could be made of its debt owed to Galmor's/G&G Steam Service, Inc.

*Id*. at p. 3 (emphasis added).  Likewise:

> In addition to the actual funds advanced to the Galmor Family Limited Partnership and expenses paid on behalf of the Galmor Family Limited Partnership, Galmor's/G&G Steam Service, Inc. paid the salaries of me and my secretary, Deena Carter.  After my father passed away a substantial part of my time and Deena Carter's time was used to take care of the Galmor Family Limited Partnership's land and business operations, and for the care of my mother.  Working with my bankruptcy counsel, we estimated that approximately two thirds of the cost to Galmor's/G&G Steam Service, Inc. for the salary and benefits of myself and Deena Carter should be allocated and charged to the Galmor Family Limited Partnership. . .  Therefore the fourth part of Question #74 on Galmor's/G&G Steam Service, Inc. bankruptcy schedules states that the Galmor Family Limited Partnership should reimburse Galmor's/G&G Steam Service, Inc. for these expenses in the amount of $500,000.00.

*Id*. at p. 5.

55.     Mr. Galmor may testify as to *his* expectation, or that of the Debtor, that the FLP would "repay this debt," but that is not evidence of the FLP's agreement to pay the Alleged Debt. Mr. Galmor may believe that wages paid to him and his controller "should be allocated and charged to" the FLP, or that the FLP "should reimburse" the Debtor for these expenses, but inadmissible as that opinion testimony is, it is no evidence of the FLP's agreement to be charged with these expenses. And, where Mr. Galmor references the FLP's "debt owed to" the Debtor, that is a conclusory and not a factual statement. This is all the more so when all reasonable inferences must be construed against the Trustee on summary judgment.

56.     The meaninglessness and conclusory nature of Mr. Galmor's testimony is exemplified by his discussion of the Debtor's alleged payoff of his mother's van. As discussed above, the evidence is clear that his mother owned the van, that she was liable for the debt on the van, and that it was Mr. Galmor and not the Debtor who paid off the van. Even so, Mr. Galmor testifies as follows:

> Third, Galmor's/G&G Steam Service, Inc. paid off the debt on a 2014 Dodge van that had been purchased by my mother to transport her with handicapped accessible equipment. The amount paid on May 19, 2017 was $24,807.39. This debt should have been paid by the Galmor Family Limited Partnership, but it had insufficient funds to do so.

Galmor Affidavit at p. 4.

57.     Mr. Galmor makes no attempt to explain why this payment should be any obligation of the FLP, how the FLP would have been benefited, and whether the FLP ever agreed to pay this debt. Likewise with respect to his belief that the FLP should reimburse the Debtor for two-thirds (2/3d) of his and his controller's salaries! *See* Galmor Affidavit at p. 5. Mr. Galmor ran the Debtor, a multi-million dollar company, as well as other companies. But now he asserts that the FLP should pay *two-thirds* of his and others' salaries, completely absent is any discussion of why. Why

should the FLP be charged with the salaries of people who were not FLP employees; how was the FLP benefited; and where did the FLP ever agree to be liable for these charges? And, Mr. Galmor does not explain why the FLP should be charged with of the costs he or the Debtor allegedly expended to help his mother. Even if Mr. Galmor is correct that "[t]he Galmor Family Limited Partnership was set up and funded by my parents with most all of their assets to take care of their living expenses in their retirement years," which is inadmissible opinion testimony, none of that explains why he or the Debtor would then be making advances to the FLP after his parents passed away. The Trustee and Mr. Galmor make no attempt to present any evidence on these key elements of the Trustee's contract case.

58. Therefore, in addition to the Trustee failing to present admissible evidence of the Alleged Debt, and existence of the Alleged Debt being in genuine and material dispute, the Trustee has wholly failed to offer any evidence that the FLP ever agreed to pay the Debtor the amounts that the Trustee claims. At a minimum, for the same reasons discussed above, the balance sheet of the FLP, the Accounting prepared by Mr. Galmor for the FLP, and the FLP's tax returns demonstrate that the FLP itself did not consider itself bound to pay the Alleged Debt, meaning that there is at least a genuine issue of material fact on the contract-formation elements of 'acceptance" and "meeting of the minds.'

59. Accordingly, the Court should deny the Trustee summary judgment on his contract claims because the Trustee has failed to present evidence, admissible or otherwise, on the elements required for contract formation, and because, at a minimum, there is a genuine dispute of material fact regarding these elements.

### 2. No Claim for Money Had and Received

60. The Trustee seeks to recover the Alleged Debt under a claim for money had and received. As explained below, most of the Alleged Debt and Alleged Advances comprising this

claim are barred by limitations. With respect to the balance of the Alleged Debt, an element of the claim is that "a defendant holds money had." *Edwards v. Mid-Continent Office Distribs. L.P.*, 252 S.W.3d 833, 837 (Tex. App. – Dallas 2008). The plaintiff must prove that the "defendant holds money . . ." *Midwestern Cattle Mktg. LLC v. Legend Bank N.A.*, 800 Fed. App. 239, 246 (5th Cir. 2020). The Trustee has made no showing that the FLP is holding any money allegedly advanced by the Debtor. He has not even attempted to present any evidence on this element. On the contrary, the FLP is not holding any money claimable or claimed by the Debtor, even if the FLP is holding funds from litigating its assets against which the Debtor makes a claim as an *unsecured* creditor.

61. Accordingly, the Court should deny the Trustee summary judgment on all of his claims for money had and received and should grant Pritchard summary judgment denying these claims.

### 3. No Claim for *Quantum Meruit*

62. The trustee asserts *quantum meruit* for the following: "G&G's claim for $384,902.74 is based on the numerous invoices contained in and described by Matt Brooks' affidavit. G&G's claim for $24,807.39 is based on the payoff of a lien debt on a vehicle that should have been paid by the GFLP. G&G's claim for $500,000.00 is based on wages of MSG and Deena Carter that were paid by G&G, but benefitted the GFLP." Trustee Brief at pp. 7-8.

63. The elements of quantum meruit are: "1) valuable services and/or materials were furnished, 2) to the party sought to be charged, 3) which were accepted by the party sought to be charged, and 4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros. Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Here, there is a complete lack of evidence, admissible or inadmissible, on the second, third, and fourth elements.

64.     Most fundamentally, the Trustee does not attempt to explain, much less evidence, how the Alleged Debt benefited the FLP or was accepted by the FLP.  There is no discussion of why the FLP should, in equity, be liable to the Debtor for any of the wages of Mr. Galmor or Ms. Carter and how their alleged employment by the Debtor benefitted the FLP or even what it is that they allegedly did for the FLP.  Nor is there any explanation of the factual basis for why Mr. Galmor "estimated that approximately two thirds of the cost to Galmor's/G&G Steam Service, Inc. for the salary and benefits of myself and Deena Carter should be allocated and charged to the Galmor Family Limited Partnership."  Galmor Affidavit at p.5.

65.     Likewise for the Invoices.  While the Invoices, if they are admissible, list various employees of the Debtor and the salaries and benefits of those employees, there is no discussion or evidence as to why the services of these employees were billed to the FLP, why they benefitted the FLP, when and how the FLP accepted these services, and why the FLP should repay for these services.  Invoice No. 121090 dated July 25, 2014 proves the point.  This Invoice lists numerous entries for dates and times for "Dirt work at farm" between March, 2014 and May, 2014 for which the Trustee now seeks $76,122.50.  What dirt work?  What farm?  Whose farm?  How was the FLP benefited, if it was even the FLP's "farm."  Equally questionable, this invoice lists multiple work orders (*e.g.* WO#1260), none of which have been produced.

66.     Likewise with respect to the van.  Mr. Galmor states that the Debtor paid $24,807.39 for a van purchased by his mother, and that this "debt should have been paid by the [FLP]."  Galmor Affidavit at p. 4.  Yet the van was owned by the mother and the debt on the van was owed by the mother—or, it was not owed by the FLP.  The FLP had no obligation to pay the van, and the FLP received no benefit from paying off the van.  The whole claim is illogical on its face, which is perhaps why Mr. Galmor makes no attempt to explain its factual basis.  In truth, and while taking care of his mother is certain laudable, the Debtor and Mr. Galmor were volunteers.

67. But the biggest problem for the Trustee is the last two elements, because there is no evidence that the FLP accepted any services under such circumstances that the FLP was reasonably notified that the Debtor expected payment. Mr. Galmor does not even attempt to satisfy these elements. Nor can he, as the FLP's tax statements (approved and signed by him), internal accounting records (under his control), and state law Accounting (prepared under his direction during litigation) fail completely to record this liability anywhere. In other words, if the FLP expected to have to pay for these Alleged Debts, then why did it repeatedly fail to record the liabilities anywhere? At a minimum, there is a genuine issue of material fact on the elements.

68. Accordingly, the Court should deny the Trustee summary judgment on his *quantum meruit* claims because he has failed to present evidence, admissible or otherwise, on the necessary elements and because, at a minimum, there is a genuine dispute of material fact on those elements.

## D. STATUTE OF LIMITATIONS BARS CERTAIN CLAIMS

### 1. Breach of Contract / Debt

69. The Trustee's whole theory of the case is that any expenses paid or advanced by the Debtor because due the moment they were paid or advanced because the expectation of repayment was triggered right then. The Texas statute of limitations on debt is four (4) years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(3). *Quantum meruit* likewise has a four (4) year statute of limitations, *see, e.g., Pepi Corp. v. Galliford*, 254 S.W.3d 457, 461 (Tex. App. – Houston [1st Dist.] 2007). Here, the Trustee first commenced suit on August 30, 2019—well after limitations for most of the Invoices expired. *See* Adversary Proceeding No. 19-02006. Of course, the Trustee has an extension of two years after the order for relief to commence suit, *see* 11 U.S.C. § 108(a)(2), but only with respect to claims where limitations had not attached. Thus, as the Petition Date was June 19, 2018, any claims that the Debtor had prior to that date are barred by

limitations. In turn, this means that any claims the Debtor had for the Invoices prior to June 19, 2014 are barred by limitations.

70. Invoice No. 121090, dated July 25, 2014, reflects various dates of service, from March 21, 2014 to May 5, 2014, in the total amount of $80,880.16. *See* Brooks Affidavit at SG_016891-97. This invoice is barred by limitations in full because all of the underlying services were provided prior to June 19, 2014.

71. Invoice No. 120423, dated June 30, 2014, contains multiple charges for wages and related expenses "from 01/01/2014 to 06/30/2014," in the total amount of $44,064.35. *See* Brooks Affidavit at SG_016911. This invoice is barred by limitations in full because all of the underlying services were provided prior to June 19, 2014.

72. Accordingly, Pritchard requests that the Court deny the Trustee summary judgment on Invoice No. 121090 and Invoice No. 120423 for breach of contract and *quantum meruit*, on the grounds of limitations, and that the Court instead grant Pritchard summary judgment that these two invoices, totaling $124,944.51, are barred by limitations for breach of contract and *quantum meruit*.

## 2. Unjust Enrichment / Money Had and Received

73. A claim for unjust enrichment is subject to a two (2) year statute of limitations. *See Elldge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 870-71 (Tex. 2007) (construing unjust enrichment as an action for the "taking . . . the personal property of another" within application of TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a)). A claim for money had and received is subject to a two (2) year statute of limitations. *See, e.g., Payne v. Wells Fargo Bank N.A.*, 2015 U.S. Dist. LEXIS 39325 at *13-*14 (N.D. Tex. 2015); *Merry Homes Inc. v. Luc Dao*, 359 S.W.3d 881, 884 (Tex. App.—Houston 2012, no pet.).

74. Here, the following Invoices are for alleged services prior to June 19, 2016:

| Number | Date/Bates | Amount |
|--------|-----------|--------|
| 121693 | 8/29/2014 (SG_016741) | $842.03 |
| 121188 | 8/11/2014 (SG_016742) | $1,950.00 |
| 121090 | 7/25/2014 (SG_016891-97) | $80,880.16 |
| 127966 | 9/30/2016 (mostly for pre-6/19/2016 services) SG_016900- | $72,540.90 |
| 126112 | 10/31/2015 (SG_016904) | $107,636.27 |
| 120423 | 6/30/2014 (SG_016911) | $44,064.35 |
| 121125 | 7/31/2014 (SG_016912) | $5,251.57 |
| 121994 | 8/31/2014 (SG_016913) | $6,691.41 |
| 122454 | 9/30/2014 (SG_016914) | $6,372.43 |
| 123004 | 10/31/2014 (SG_016915) | $7,161.89 |
| 123558 | 11/30/2014 (SG_016916) | $13,522.47 |
| 123993 | 12/31/2014 (SG_016917) | $11,976.04 |
| 124565 | 1/31/2015 (SG_016918) | $10,869.22 |

75.     Likewise, most of the Alleged Advances, totaling $453,850.00, were allegedly made before June 19, 2016. *See* Brooks Affidavit at Exhibit B (SG_016723-25).

76.     Accordingly, Pritchard requests that the Court deny the Trustee summary judgment on the foregoing Invoices and $453,850.00 of the Alleged Advances for unjust enrichment and money had and received, on the grounds of limitations, and that the Court instead grant Pritchard summary judgment that the foregoing Invoices and $453,850.00 of the Alleged Advances are barred by limitations for unjust enrichment and money had and received.

E.     **JUDGMENT THAT COLLATERAL ESTOPPEL AND *RES JUDICATA* DO NOT APPLY**

77.     The Trustee makes the remarkable argument that, because the Debtor scheduled the Alleged Debt under penalty of perjury, "[c]ollateral estoppel prevents the Defendants from refuting the contract at issue." Trustee Brief at p. 6. Under the Trustee's theory, bankruptcy schedules are binding on the world, and third parties are bound by alleged debts listed! This is dangerous and unprecedented. More to the point, however, the Trustee ignores the elements of collateral estoppel, which are: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated;

and (3) the previous determination was necessary to the decision." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005).

78.     The Trustee also argues that *res judicata* applies, although he fails to specify why. The elements of *res judicata* are: "'(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.'" *BVS Constr. v. Prosperity Bank (In re BVS Constr., Inc.)*, __ F.4th __, 2021 U.S. App. LEXIS 33822, *9-10 (5th Cir. Nov. 15, 2021) (quoting *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004)).

79.     Here, there has been no prior judgment concerning any of the Alleged Debt. *See* PAPP 1292 at ¶ 8.  Collateral estoppel and *res judicata* simply do not apply.  Pritchard therefore requests that the Court deny the Trustee summary judgment to the extent his claims are based on collateral estoppel or *res judicata* and that the Court instead grant her summary judgment that neither collateral estoppel nor *res judicata* apply to the Alleged Debt.

## V.     <u>CONCLUSION</u>

80.     The Trustee asks this Court to conclude that there is no genuine issue of material fact concerning the Alleged Debt, even though the Debtor; *i.e.* the creditor, did not carry the Alleged Debt on its books and records, even though the FLP; *i.e.* the borrower, did not carry the Alleged Debt on its books and records or on its tax returns, and even though Mr. Galmor, in control of both entities, failed to list the Alleged Debt on the very Accounting that Texas law required him to provide.  If that is not a genuine and disputed issue of material fact, then it is hard to envision what would be, unless the Court concludes that Mr. Galmor is credible notwithstanding these other facts.  But that is precisely the point: the Court cannot make that determination on summary judgment.  The Trustee simply jumped the gun: he will have his chance at trial, when the Court

can make a final and informed decision on Mr. Galmor's credibility. The Court should deny the Trustee summary judgment and grant Pritchard her requested partial summary judgment.

## VI.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Pritchard respectfully requests that the Court enter an order (1) denying the Motion; (2) granting the Cross Motion; and (3) providing her such other and further relief to which she is entitled at law or in equity.

RESPECTFULLY SUBMITTED this 8th day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

/s/ Davor Rukavina
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Ross Tower
    500 North Akard St.
    Dallas, Texas 75201
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375

**ATTORNEYS FOR LESLIE
PRITCHARD / DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 8, 2021, he caused a true and correct copy of this document to be served electronically via the Court's CM/ECF system on all parties entitled to such notice, including counsel for the Trustee.

/s/ Davor Rukavina
_____
    Davor Rukavina, Esq.