IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MICHAEL STEPHEN GALMOR, | § | CASE NO. 18-20209-RLJ-7 |
| | § | |
| Debtor. | § | |
| | § | |
| And | § | |
| | § | |
| GALMOR'S/G&G STEAM SERVICE, INC., | § | CASE NO. 18-20210-RLJ-7 |
| | § | |
| Debtor. | § | |
| | § | |
| KENT RIES, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 20-2003 |
| | § | |
| GALMOR FAMILY LIMITED PARTNERSHIP and GALMOR MANAGEMENT, L.L.C., | § | |
| | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TO THE HONORABLE ROBERT JONES, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Leslie Pritchard ("Pritchard"), court-appointed liquidator for Galmor Family Limited Partnership (the "FLP") and Galmor Management, L.L.C. ("GM", with the FLP, the "Defendants"), the defendants in the above styled and numbered Adversary Proceeding, and files this *Proposed Findings of Fact and Conclusions of Law* as follows:

## I.    SUMMARY

1.    This Adversary Proceeding concerns claims by Kent Ries, Trustee (the "Trustee"), to recover from the FLP (and from GM, as the FLP's general partner), alleged debts arising from

oral contracts owed to the MSG estate (defined below) and the G&G estate (defined below). Specifically, the Trustee alleges that the FLP owes the MSG estate $1,310,807.00 for amounts that MSG alleged funded the FLP with or that he expended for the FLP's benefit, and that the FLP owes the G&G estate $1,096,051.32 for amounts that G&G alleged funded the FLP with or that it expended for the FLP's benefit (collectively, the "Alleged Debts"). The FLP, managed by Pritchard, denies any liability. By counterclaim, the FLP seeks to setoff or to forfeit whatever ultimate distribution the MSG estate may receive from its indirect equity interests in the FLP upon a liquidation of the FLP, on account of MSG's alleged breaches of fiduciary duty, self-dealing, and defalcation to and of the FLP while MSG managed the FLP. Trial was held on _____.

2. Having considered the evidence and arguments of counsel, having considered the credibility of the witnesses, and having reviewed all applicable law, the Court now enters these Findings of Fact and Conclusions of law concluding that: (i) all claims of the Trustee for the Alleged Debt are denied; (ii) whatever distribution the MSG estate will receive upon the final liquidation of the FLP is setoff and forfeited for MSG's torts, such that the MSG estate shall receive no such distribution; and (iii) the FLP is entitled to an award of its reasonable attorney's fees and expenses incurred herein.

## II.     FINDINGS OF FACT

### A.    THE GALMORS

3. Bobby Don Galmor ("BDG") and Shirley Joe Galmor ("SJG") were married for many years and raised a loving family in and near Shamrock, Texas. They had five children, all of whom are still alive: (i) MSG; (ii) Leslie Pritchard ("Pritchard"); (iii) Traci Coleman; (iv) Rudas (Mark) Galmor; and (v) Shawn Zaiontz.

4. MSG, as both the oldest son and as a partner with his father in various businesses, was especially trusted by his parents to help with their business, their finances, and their ultimate

estate planning. Pritchard and Zaiontz had moved away from home, while Coleman had her own family and life and Rudas was not fit to run businesses or handle finances and investments. In sum, BDG and SJG trusted MSG and trusted that, after their deaths, he would take care of various vehicles they set up for their children and their estate planning in a manner that would fairly protect and look after the interests of all of their children.

5.      As they grew older and worked hard, BDG and SJG created considerable wealth for themselves and their family. BDG in particular worked mainly in the oilfield services business, including so-called "steam cleaning" of pipes. He diversified and invested his accumulating wealth into real property, oil and gas holdings, farm and ranching, and other investments and endeavors. SJG was primarily a homemaker.

6.      As BDG and SJG grew older, and as health issues arose, they began to engage in estate planning with the assistance of attorneys and accountants. Through complicated trusts and entities, as discussed below, they created a mechanism which they believed would fairly and equally pass their wealth to their five children and would minimize or eliminate inheritance taxes, which at that time existed.

7.      BDG passed away on April 3, 2013.

8.      SJG passed away on March 13, 2017. At the time of her death, she had been sick and partially immobile for several years, and required in-home care.

9.      BDG and SJG lived on approximately 175 acres of land, with improvements, including a house and barns, generally located at 6535 U.S. Highway 83, Shamrock, Texas (the "Homestead").

**B.      THE DEFENDANTS**

10.     The FLP is a limited partnership organized and existing under the laws of the State of Texas. It was created as part of the estate planning of BDG and SJG.

11.     GM is a limited liability company organized and existing under the laws of the State of Texas.

12.     GM is the sole general partner of the FLP.

13.     The FLP is governed  by the *Agreement of Limited Partnership of Galmor Family Limited Partnership* (the "<u>FLP Agreement</u>"), dated December 1, 2020.

14.     At or shortly after that time, BDG and SJG funded the FLP with various real estate properties, oil and gas interests, vehicles, trucks, trailers and equipment used in the farming and ranching business.  The intent and purpose of the FLP was that it would thereafter manage and operate these assets as a business for the benefit of the FLP's partners.

15.     The Homestead was never transferred to the FLP and the FLP never owned an interest in the Homestead.

16.     At its inception, the FLP was owned: (i) 1% by GM; (ii) 49.5% by BDG; and (iii) 49.5% by SJG.

17.     Upon his death, BDG's interests in the FLP passed to The Bobby Don and Shirley Jo Galmor Living Trust Dated July 20, 2005.

18.     Also upon his death, the Galmor Family Trust (the "<u>Family Trust</u>") was created.

19.     Also upon his death, the Galmor Contribution Trust (the "<u>Contribution Trust</u>") was created.

20.     Upon the death of SJG, the ownership of the FLP was: (i) 1% by GM; (ii) 49.5% by the Family Trust; and (iii) 49.5% by the Contribution Trust.

21.     MSG owns an interest in the Family Trust and the Contribution Trust, as do the other siblings, although there is a dispute (which is not resolved herein) regarding whether Zaiontz was cut out of the trusts.  In any event, albeit indirectly, MSG owns a one-quarter or a one-fifth indirect interest in the FLP, ignoring the 1% owned by GM.

22.     After the death of BDG, MSG was the sole manager and officer of the FLP. Even though the FLP was managed by GM, all decisions on behalf of the FLP were made by MSG, either directly as the manager of the FLP or indirectly as the manager of GM.

23.     At all times relevant hereto, MSG owed fiduciary duties to the FLP under Texas law, including the duty of loyalty, the duty of care, the duty to not self-deal, and the duty to not commit waste of the FLP's property.

24.     Pritchard became the sole manager or officer of the FLP in August, 2019 pursuant to the Agreed Judgment (defined below).

## C.     THE DEBTORS

25.     MSG filed a voluntary petition for relief under Chapter 11 on June 19, 2018, thereby initiating Bankruptcy Case No. 18-20209. The Court ordered the conversion of his case to Chapter 7 on January 8, 2019.

26.     The Trustee is the duly appointed trustee of the MSG estate.

27.     G&G filed a voluntary petition for relief under Chapter 11 on June 19, 2018, thereby initiating Bankruptcy Case No. 18-20210. The Court ordered the conversion of its case to Chapter 7 on January 8, 2019.

28.     The Trustee is the duly appointed trustee of the G&G estate.

29.     At all times relevant hereto, MSG was the sole owner and officer of G&G.

30.     At all times relevant hereto, G&G was involved in multiple businesses, with income of millions of dollars per year. Among other things, G&G was in the "steam cleaning" pipe business and in the oilfield business.

31.     Among other businesses, G&G operated a rock quarry (the "Quarry"). The land on which the Quarry was operated and from which G&G mined and extracted rock was located on real property owned by the FLP. G&G, at its expense and burden, and using its employees and

equipment, would extract the rock and sell it to third parties. In exchange, G&G would pay the FLP a royalty for every ton of rock that it extracted.

32. G&G also mined and extracted rock from quarries in the Panhandle area owned by third parties.

33. Since at least 2012 to May, 2013, G&G paid the FLP 75 cents per ton of rock it extracted from the Quarry.

34. Beginning in May, 2013, weeks after BDG died and no longer managed the FLP, MSG changed the royalty such that, from then until the end of the business, G&G was paying the FLP 50 cents per ton of rock that it extracted.

35. At the same time, G&G was paying $1 per ton to $2 per ton to third parties from who it also mined and extracted rock.

36. G&G benefited at the expense of the FLP when MSG lowered the per ton price from 75 cents to 50 cents. He did so solely to benefit his wholly owned business, G&G, at the expense of the FLP.

37. While she was alive, SJG transferred her one-half interest in the Homestead to MSG. MSG also purchased BDG's half-interest in the Homestead, executing a note for the purchase price in the amount of $250,000.00, and payable to one of the foregoing trusts.

38. Prichard and MSG (and others) were involved in prepetition litigation in state court regarding, generally, the legitimacy of the will and probate of SJG and the actions of MSG as trustee of various trusts and as manager of the FLP.

39. On September 4, 2018, Pritchard, on behalf of herself, the GFLP, and other entities filed a complaint against MSG and G&G with the Court, thereby initiating Adversary Proceeding No. 18-02010 (the "Pritchard Adversary"). Among other things, by the Pritchard Complaint,

Pritchard alleged various torts against MSG, and also sought objections to both the dischargeability of debt and to MSG's discharge under sections 523 and 727 of the Bankruptcy Code.

40.     In the MSG bankruptcy case, Pritchard filed proof of claim number 15, as later amended, asserting claims on behalf of herself, the FLP, and other entities based on MSG's alleged fraudulent transfers of property to himself, breaches of fiduciary duty, misappropriation, and other alleged torts as pled in the Pritchard Adversary.

41.     In the G&G bankruptcy case, Pritchard filed proof of claim number 32, as later amended, asserting claims on behalf of herself, the FLP, and other entities based on MSG's alleged fraudulent transfers of property to himself, breaches of fiduciary duty, misappropriation, and other alleged torts as pled in the Pritchard Complaint.

42.     In August, 2019, MSG, Pritchard, and Traci Coleman entered into a settlement agreement to resolve various claims between them, including the Pritchard Adversary (the "Partial Settlement").  Among other things, by the Partial Settlement, Pritchard dismissed her will contest suit and the Pritchard Adversary, thus also dismissing Prichard's claims objecting to the dischargeability of debt and of MSG's discharge.  Additionally, MSG was released of his remaining debt on the Homestead.

43.     As part of the Partial Settlement, MSG assigned his interests in the trusts, and therefore his indirect interests in the FLP, to the trusts.  However, because these interests were then property of his bankruptcy estate under the exclusive administration of the Trustee, who did not sign the Partial Settlement, those assignments are invalid.

44.     Thus, by the Partial Settlement, MSG was able to obtain a release of Pritchard's discharge and discharegability claims, and of his debt remaining on the Homestead, without delivering the promised return consideration.  This is significant because MSG used the Accounting (defined below) to induce detrimental reliance on the part of Pritchard to agree to the

foregoing, and on which Accounting Pritchard did rely, to her detriment, in entering into the Partial Settlement.   Pritchard would not have entered into the Partial Settlement without the Accounting.

45.     The Trustee subsequently objected to Pritchard's claim number 32 on the basis that the claim had been released or disallowed as a result of the Partial Settlement, even though the Partial Settlement was not binding on the Trustee or on his estates.  On October 27, 2020, the Court entered an order in the G&G case disallowing claim number 32 in full.

46.     The Pritchard Adversary has since been dismissed, and MSG has received his Chapter 7 discharge.

47.     The Trustee also objected to Pritchard's claim number 15 in the MSG case on the same basis.  In the MSG bankruptcy case, on December 10, 2020, the Court entered its *Agreed Order Sustaining Trustee's Objection to Claim No. 15 of Leslie Pritchard* [docket no. 201] (the "Claims Order").   By the same, Claim No. 15 was disallowed, but without prejudice to this Adversary Proceeding, as otherwise provided in the Claim Order.   Specifically, the Claim Order provides that:

> the disallowance of the Subject Claim is not a substantive determination of its merits and is without prejudice as to any other matter other than a distribution or payment from the Estate, including without prejudice as to Adversary Proceeding No. 20-2003, where Pritchard may plead claims asserted against the Debtor in the Subject Claim for breach of fiduciary duty, self-dealing, or defalcation with respect to the Debtor's management of and role with Galmor Family Limited Partnership and/or Galmor Management, L.L.C., solely by way of setoff and defense against the Trustee's claims asserted therein, and with respect to any distribution of the proceeds and assets of either or both such entities that may be payable to the Debtor as creditor or otherwise, but in no event may Pritchard plead any such claims to obtain an affirmative recovery from the Estate.

48.     On August 30, 2019, the Trustee filed a complaint, thereby initiating Adversary Proceeding No. 19-02006 ("Adversary 19-02006"), to generally collect from the FLP the Alleged Debt, and to compel the liquidation of the FLP so that it may pay its debts and distribute any remaining proceeds to its interest holders.

49.     After negotiations between Pritchard and the Trustee, on April 24, 2020, the Court entered its *Agreed Judgment: (i) Ordering Supervised Liquidation of Texas Entities; (ii) Appointing Managers of the Same; and (iii) Severing Remaining Claims* [docket no. 26] (the "Agreed Judgment"). Pursuant to the Agreed Judgment, and as more fully set forth therein, the Court: (i) ordered the liquidation of the FLP and the GM; (ii) appointed the Trustee to liquidate and manage the real properties owned by the FLP; (iii) appointed Pritchard to liquidate and manage all other properties of the FLP; (iv) appointed Pritchard to wind-down and liquidate the FLP and the GM; and (v) severed the Trustee's claims against the FLP and the GM into this Adversary Proceeding.

50.     Pritchard therefore represents all interests in the FLP and GM in this Adversary Proceeding.

51.     Pursuant to the Agreed Judgment, the Trustee has sold the real properties of the FLP and, after payment of various claims, presently holds net proceeds of $1,642,742.50.

52.     The Trustee holds two interests against the FLP.  First, he holds the Alleged Debts as a creditor.  Second, and indirectly through the Trusts, he holds a claim to MSG's distribution of the proceeds of the FLP remaining after the FLP is liquidated.

**D.    THE ALLEGED DEBT**

53.     MSG, on his bankruptcy schedules, signed and filed under penalty of perjury, scheduled an alleged debt by the FLP to him in the amount of $1,310,807.00.  MSG generally alleges that the FLP owed him these amounts for advances he made to, or for the benefit of, the FLP, and for unpaid compensation.

54.     G&G, on its bankruptcy schedules, signed and filed under penalty of perjury by MSG, scheduled an alleged debt by the GFLP to it in the amount of $1,096,051.32.  This amount is generally broken down as follows: (i) $186,341.19 in advances paid to the FLP for rock quarry

royalties, which G&G did not use (the "Alleged Advances"); (ii) $384,341.19 for advances, labor, services, and goods provided by G&G to the FLP and evidenced by alleged unpaid invoices from G&G to the GFLP (the "Alleged Invoices"); (iii) $24,807.39 for funds used to pay off the debt of a van allegedly needed and used by the FLP; and (iv) $500,000.00 for alleged wages of MSG and Deena Carter that benefited the FLP.

55. MSG is not unsophisticated. Although he is from a small, rural town and although he likes to play up his simple, cowboy style, he is a shrewd businessman, he operated multi-million dollar companies for years, and successfully at that, he employed scores of people, and he knows how to handle businesses, finances, and basic accounting. He knows what fiduciary duties are and what is expected of a fiduciary and a businessman.

56. Furthermore, he had the assistance, with respect the books and records, and tax filings, of himself, G&G, and the FLP, of Deena Carter, a capable bookkeeper, and of Kelly Fuchs, a licensed accountant. MSG, G&G, other businesses of MSG, and the FLP all maintained accounting records on QuickBooks, employing capable staff and generally keeping these QuickBook files current and accurate. They all filed federal tax returns with the assistance of an outside, licensed accountant.

57. Both MSG and Ms. Carter, testified at deposition, at the meeting of creditors, and at trial, that the FLP kept its accounting records in a QuickBooks file that was turned over by them to the Trustee. Pritchard's expert, with the Trustee's assistance and his presence, turned on the server and opened all the QuickBook files. While all the files were there for MSG, G&G, and various other entities owned by MSG, the file for the FLP was not there and could not be located anywhere by Pritchard, her expert, or the Trustee.

58. What QuickBooks records of the FLP that Pritchard has were produced to her in her prepetition litigation against MSG. And, the Accounting, prepared in June or July, 2019, also

contained limited QuickBooks records and files of the FLP. If the server had been provided by MSG and Ms. Carter to the Trustee months before that, then how did MSG obtain these printouts for the Accounting, unless there was some other copy of the QuickBooks file in existence, which both MSG and Ms. Carter denied.

59.    The Court therefore finds that MSG, and possibly Ms. Carter, are not being truthful regarding the existence and whereabouts of the QuickBooks file of the FLP. Despite their testimony, that file was not provided to the Trustee and it is not on the server turned over to the Trustee, but that file existed at least as of June or July, 2019, in some other location in order to enable the Accounting (defined below).

60.    Based on the actual evidence, the circumstantial evidence, and the credibility (or lack thereof) of MSG, the Court finds that MSG, alone or with the assistance of others, actually and actively destroyed, deleted, or hid the FLP's QuickBooks file in order to hide evidence of his torts, breaches of fiduciary duty, and misdeeds perpetuated by him on the FLP.

61.    MSG is not credible, both generally and specifically regarding the Alleged Debt. Among other things:

(i)     MSG gave evasive, misleading, and false testimony;

(ii)    the issues concerning the FLP's QuickBooks files and MSG's false and misleading testimony regarding the same;

(iii)   MSG's self-dealing and breaches of fiduciary duty to the FLP, as detailed below, including taking its property and funds for himself and for his benefit, and while acting on both sides of a transaction, lowering the price per ton of rock from the Quarry by one-third very soon after BDG died for no purpose other than to obtain a windfall for G&G at the expense of the FLP;

(iv)    MSG's inconsistent and false statements to third parties regarding the Alleged Debt, as detailed below; and

(v)     MSG's perjury and inducement to others to commit perjury and to forge signatures, including Matt Brooks and Traci Coleman, all for MSG's benefit.

62.     The Court finds credible the expert testimony of Maison Vasek ("<u>Vasek</u>"), a licensed accountant, with substantial accounting and audit experience, including forensic accounting.

63.     There is no written contract for any of the Alleged Debt, and no promissory note.

64.     The Court finds that there was no oral contract for any of the Alleged Debt, and no promise or agreement by the FLP ever to repay any of the Alleged Debt.  Among other things:

(i)     the existence of the Alleged Debt depends on the credibility of MSG, who is not credible;

(ii)    Vasek testified credibly that, with one exception, there is no record anywhere in the books and records, and tax returns, of MSG, G&G, and the FLP evidencing the Alleged Debt, including in places where the Alleged Debt should have been disclosed and listed, and including because these persons and entities were sophisticated enough such that they would or should have listed the Alleged Debt if it really existed at the time;

(iii)   the tax returns of MSG, G&G, and the FLP do not list the Alleged Debt, even though these were prepared by a professional accountant under the supervision of MSG, who surely would have remembered the Alleged Debt then, if it existed;

(iv)    certain QuickBooks records of the FLP, which MSG produced to Pritchard in prepetition litigation, do not list the Alleged Debt;

(v)     the QuickBooks records of MSG do not list the Alleged Debt;

(vi)    the QuickBook records of G&G do not list the Alleged Advances;

(vii)   the most recent QuickBook records of G&G do not list the Alleged Invoices, although a prior version of the QuickBooks files does list them, meaning either that G&G did not consider them legitimate or valid in order to include in the new file or that someone went into the old file, not knowing there was a new one, to list them;

(viii)  MSG's inability to explain why the FLP would allegedly need more than $2 million in funding, when it had its own revenues and its tax returns demonstrated that it was servicing its obligations;

(ix)    MSG's inability to explain the factual basis for, and the need for, the Alleged Debt, including any repayment terms;

(x)     the fact that neither MSG nor G&G did anything to collect on the Alleged Debt, for years, prior to bankruptcy;

(xi)    the lack of any benefit to the FLP for many of the Alleged Invoices and Alleged Debt;

(xii)   the obvious attempt to shift most of his and Ms. Carter's salary to the FLP, without any plausible basis to assert that they spent so much of their time working on FLP business, which was neither complicated nor involved, as opposed to working on MSG's other businesses; and

(xiii)  very importantly, the Accounting.

65.     The "Accounting" is a document provided by MSG to Pritchard in the prepetition litigation between them. Pritchard had demanded an accounting of the FLP from MSG, as its manager and officer, pursuant to Texas Property Code sections 113.151 and 113.152. Ms. Carter prepared this Accounting, and showed it to MSG for his approval. This was in June or July, 2019—after MSG had filed his and G&G bankruptcy schedules. This Accounting purported to list *all* liabilities and obligations of the FLP, as was indeed required by Texas statute. Yet, it fails to list any of the Alleged Debt.

66.     It is simply inconceivable that either MSG or Ms. Carter would forget a $2.4 million alleged obligation of the FLP, if it actually existed, especially considering that this was after the bankruptcy schedules, in the middle of litigation, and pursuant to Texas statute. Alternatively, MSG lied on the Accounting regarding the Alleged Debt in order to induce detrimental reliance on the part of Pritchard and other siblings who, in reliance on the Accounting, agreed to enter into the Partial Settlement (defined below) with MSG, pursuant to which he obtained large benefits.

67.     Nor did the Alleged Debt benefit the FLP. The Alleged Advances, to the extent they actually existed, would never have existed had MSG not caused G&G to underpay the FLP for royalties at the Quarry for his benefit. There is no evidence of what the funds from the Alleged Advances were used for. More than likely, they were used by the FLP to continue contributing to

MSG's lavish lifestyle, or to fund legitimate expenses of the FLP, but only because MSG had otherwise denuded the FLP such that it did not have money to pay those expenses. But all that is only if the Alleged Advances are even valid and existed in the first place, which they did not.

68.     The Alleged Invoices did not benefit the FLP. Much of those Alleged Invoices concern building a pond on the Homestead, which was never owned by the FLP, and which was instead owned by SJG and MSG. The FLP had no obligation to pay for those and had no benefit from improving the real property owned by another. Likewise, many of the Alleged Invoices are for wages and benefits of employees of G&G, and not the FLP. The FLP did not benefit from that.

69.     The FLP did not benefit from MSG's payoff of the SJG's handicapped van. First, MSG, and not G&G, paid for that van, so any claim belongs to G&G. Second, the FLP did not own the van; SJG did. Third, any obligation to pay the van was that of SJG and not the FLP. Fourth, after MSG paid the van off, he did not provide it to the FLP or sell it and provide the proceeds to the FLP.

70.     The FLP did not benefit from the services of MSG and Ms. Carter that form the wage portion of the Alleged Debt. While MSG and Ms. Carter certainly provided some services to the FLP, it was the Trustee's burden to establish the amount and benefit of such services. By simply attributing two-thirds of their wages to the FLP, itself unbelievable, without any meaningful explanation or allocation, the Court cannot decide what benefit, and in what amount, the FLP actually received.

71.     The FLP is not holding any funds belonging to either MSG or G&G.

E.     **MSG'S BREACHES OF FIDUCIARY DUTY AND TORTS**

72.     At all times relevant hereto, MSG owed fiduciary duties to the FLP, including the duty of loyalty and the duty of care. These duties, or sub-duties, included to not engage in self-dealing at the expense of the FLP and to not commit or permit waste of the FLP's property.

73.     MSG breached his fiduciary duties to the FLP through the following:

(i)     In 2014 and 2015, MSG caused the FLP to pay at least $58,000 for renovations to the Homestead.  FLP did not and does not own the Homestead, and instead MSG now does in full (and did then in part) (the "Renovation Expenditures").

(ii)    In 2015, MSG caused the FLP to pay at least $45,000 to build an outdoor kitchen at the Homestead.  FLP did not and does not own the Homestead, and instead MSG now does in full (and did then in part) (the "Kitchen Expenditures").

(iii)   MSG caused the FLP to transfer certain farm equipment it owned to MSG for no return consideration, and then caused the FLP to continue making secured debt payments on this equipment after he now owned it, in the amount of at least $50,000, including the following equipment: (i) Great Plains 42' tiller serial no. C1021B; (ii) Great Plains 42' tiller serial no. C1027B; (iii) Great Plains 42' tiller serial no. C1030B; (iv) John Deere 9300 4WD Tractor serial no. 040985 (the "Equipment Transfers");

(iv)    In 2015, MSG caused the FLP to pay repairs on the above equipment of $22,659.59, even though he owned the equipment (the "Repair Expenditures");

(v)     MSG caused the FLP to transfer title to real properties that it owned, including the "Ginyard" and the "Miller Property," to himself, for no return consideration, and then he caused the FLP to pay *ad valorem* taxes on those properties for $14,000 even though he owned them, and he deposited a check for $20,000 for the ginyard in an account other than the FLP's account, and in May, 2013, he caused the FLP to transfer other real property it owned, worth $43,800, to Jaycee Carter, for no return consideration, which property Jaycee Carter later transferred to MSG (the "Real Property Transfers");

(vi)    In 2016, MSG caused the FLP to gift certain real property it owned, worth $25,000, to Ms. Carter, with no return consideration to the FLP (the "Real Property Gift");

(vii)   MSG caused the FLP to sell certain equipment it owned, and then pocketed the proceeds for himself, including a Kubota tractor L48 with loader, and International truck, for $21,000, and he then traded in different equipment owned by the FLP, worth $18,000, in exchange for a Kubota tractor m9960hdc, which he owned (the "Equipment Sales");

(viii)  From 2013 through 2016, MSG caused the FLP to pay Wheeler General Store $60,000 for feed for cattle owned by Galmor Land and Cattle, which was owned by MSG and not by the FLP (the "Feed Payments");

(ix)    MSG ran his own cattle and that belonging to Galmor Land and Cattle on properties owned by the FLP, and spent FLP money to improve those properties so that he could do that, without paying the FLP for grazing or other costs;

(x)    If the FLP needed money for its expenses and debts, then MSG could have sold some of its property to pay those expenses and debts, and as working capital.

(xi)    MSG intentionally underpriced the rock removed from the Quarry weeks after BDG died and therefore no longer controlled the FLP, in order to provide a benefit to himself through G&G and at the expense of the FLP, which reduced amount, even before taking into account what the fair value of the royalty should have been on a market basis, caused damage of $400,000 to the FLP for lost royalties (the "Royalty Underpayment").

74.    The Renovation Expenses, Kitchen Expenses, the Equipment Transfers, the Repair Expenditures, the Real Property Transfers, the Equipment Sales, the Feed Payments, and the Royalty Underpayment: (i) constituted self-dealing that was not fair to the FLP; (ii) constituted breaches of the duty of loyalty by taking FLP property for himself or his benefit without return consideration; and (iii) constituted breaches of the duty of care, including for gross negligence, as no reasonably prudent person managing the FLP would have done so and doing so held an extreme and obvious risk of loss of value and property to the FLP. The Real Property Gift and Royalty Underpayment additionally constituted waste of FLP assets, in addition to breaching the duties of loyalty and of care. And, the foregoing constituted constructively fraudulent transfers because the FLP did not receive reasonably equivalent value in return for the transfers and expenditures.

75.    In total, MSG's breaches of fiduciary duty to the FLP caused at least $750,000 in damages to the FLP.

76.    Separately, MSG has been unable to account for various vehicles, trucks, and equipment owned by the FLP, as confirmed on various books and records and tax returns of the FLP. These include dozens of vehicles, trucks, trailers, and related equipment. He either has no memory of what happened to these items or says that they were sold and the proceeds used by the FLP, but there is no record for many of these items of any such sales and, if the proceeds were used by the FLP, that makes it all the more remote that the FLP would need funding. These items

Case 20-02003-rlj  Doc 71  Filed 02/09/22   Entered 02/09/22 22:11:48   Page 17 of 31

include: 2009 CPS Belly dump trailer; 2008 Lincoln Navigator; 2006 Jeep; 1998 GMC Yukon; Kubota Mule RTV, serial no. 33425.

77.     After her appointment, and pursuant to a turnover order by the Court, MSG did release to Pritchard various vehicles on the Homestead belonging to the FLP. But this was a small amount in comparison to what the FLP owned. And, MSG failed anywhere on his schedules to disclose that he was holding property for another, thus further demonstrating his lack of credibility.

78.     The items in the Alleged Invoices further evidence how MSG ran the FLP. If the Alleged Invoices are to be believed, which they are not, MSG had G&G bill the FLP for hundreds of thousands of dollars in services that only could have benefited MSG (as he owned the land) and G&G (where MSG was trying to get the FLP to pay G&G's wages and benefits to its employees).

79.     MSG basically ran the FLP as though it was his property existing for his benefit, expecting, eventually, to have the sole benefit from the FLP and its properties. He falsely told at least three of his siblings that the FLP was broke, insolvent, and had no value, and he fabricated the Alleged Debt as an attempt to obtain all residual value of the FLP for himself.

80.     At no time while he managed the FLP did MSG ever cause any distribution or dividend of any funds, property, or revenue of the FLP to be paid to its partners, except the indirect benefits that he was taking for himself, to the exclusion of the other partners, and in secret.

81.     Through all of the above, MSG not only breached his fiduciary duties, but the special duties of trust that his parents, and at least some of his siblings, trusted him with to manage their legacy equally for the benefit of all of their children, instead of just himself.

### III.   CONCLUSIONS OF LAW

#### A.   GENERALLY

82.     The Court has subject matter jurisdiction over all issues and claims in this Adversary Proceeding. *See* 28 U.S.C. § 1334. To the extent that any issue in this Adversary

DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW—Page 17

Proceeding is not a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), all parties have consented to this Court's entry of a final judgment and this Court therefore has the jurisdiction to enter a final judgment over all parties, issues, and claims.

83. Texas law governs all claims in this Adversary Proceeding.

84. Because the Alleged Debt claims are prepetition claims, the Trustee stands in the shoes of the debtors and is subject to all available defenses and affirmative defenses that would be available under Texas law. *See Stanley v. Trinchard*, 500 F.3d 411, 418 (5th Cir. 2007); *In re Segerstrom*, 247 F.3d 218, 223-24 (5th Cir. 2001). *Accord U.S. v. Whitting Pools Inc.*, 462 U.S. 198, 204 n. 8 (1983) ("the estate succeeds to no more or greater causes of action against third parties than those held by the debtor").

## B. TRUSTEE'S CONTRACT CLAIMS

85. To prove the existence of a contract, including an oral one, the Trustee must prove, among other elements, "an offer and acceptance and a meeting of the minds on all essential elements." *Lanier v. Eastern Founds. Inc.*, 401 S.W.3d 445, 459 (Tex. App. – Dallas 2013, no pet.). As explained:

> The term 'meeting of the minds' refers to the parties' mutual understanding and assent to the expression of their agreement. To create an enforceable contract, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms. The parties must agree to the same thing, in the same sense, at the same time.

*Id*.

86. Thus, Texas law on the formation of a contract, meaning whether an enforceable contract was reached, requires the following:

> (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding.

*Fanco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 608 (Tex. App. – El Paso 2009). Importantly, "[t]he parties' subjective thoughts and beliefs do not control. When the 'meeting of the minds' element is contested, it is a question for the fact finder." *Id*. (internal citation omitted).

87.     The Court concludes that there was no contract for any of the Alleged Debt. Specifically, the Court concludes that the FLP never agreed to pay any of the Alleged Debts. This is so for the findings above that the Alleged Debt never existed; thus, there was nothing to pay. And there was no agreement by the FLP to pay any such Alleged Debt:

(i)     MSG is not credible, and his testimony regarding the Alleged Debt is not credible;

(ii)    neither MSG nor G&G carried the Alleged Debt on their books and records (in whole or in part), including their QuickBooks files and tax returns;

(iii)   the failure by MSG to list the Alleged Debt on the Accounting provided to Pritchard, at a time when he certainly should have known of the Alleged Debt, is the best evidence that MSG, and therefore the FLP, never believed that the Alleged Debt existed prior to bankruptcy and, therefore, that the FLP ever agreed to be bound to pay any of it;

(iv)    the absence of any written agreement or any document evidencing any payment by the FLP to pay anything;

(v)     the inaction of MSG and G&G to take any action to collect any of the Alleged Debt at any time prior to bankruptcy; and

(vi)    the lack of any explanation substantiating the Alleged Debt, including why it was necessary and how it would have benefited the FLP.

88.     The Court instead concludes that MSG falsely listed the Alleged Debt on his schedules and on those of G&G.

89.     The elements for a breach of contract claim under Texas law are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Roof Sys. v. Johns Manville Corp.*, 130 S.W.3d 430, 442 (Tex. App. – Houston [14th Dist], 2004).

90.     As there was no written or oral contract by which the FLP obligated itself to pay any of the Alleged Debt, the Trustee's breach of contract claims fail as a matter of law because there was no contract for the FLP to breach, and no breach, and his breach of contract claim are denied.

## C.     TRUSTEE'S *QUANTUM MERUIT* CLAIMS

91.     The Trustee asserts that the Alleged Debt is recoverable against the FLP based on *quantum meruit*.   To succeed on these claims under Texas law, the Trustee must prove the following elements: "1) valuable services and/or materials were furnished, 2) to the party sought to be charged, 3) which were accepted by the party sought to be charged, and 4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros. Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

92.     The Trustee claims fail the first two elements.  The Trustee has failed to carry his burden of demonstrating that the Alleged Debt were services or materials furnished to the FLP or that the FLP benefited from the same.  For the reasons discussed above with respect to the Trustee's breach of contract claims, the Court does not find credible that MSG and/or G&G provided any valuable services or materials in the first place, in that the Alleged Debt and the factual bases for the same do not exist.  And, any portion of the Alleged Debt that may have consisted of services or materials were not provided to or for the benefit of the FLP, but were instead provided to benefit MSG personally.  The Trustee's claims fail on the third element for the same reasons.

93.     The Trustee's claims also fail on the fourth element, because there is no evidence that the FLP would reasonably expect that it would pay for services or materials that did not benefit it.  And the fact that the FLP did not carry or otherwise list or disclose the Alleged Debt on its books and records, tax returns, and Accounting, even though the same were under the control of MSG at all relevant times, demonstrates that it had no reasonable expectation that it would pay.

Otherwise, it would have been an easy and ministerial thing for the FLP's books and records to reflect otherwise.

94. The Trustee's claims to recover the Alleged Debt under *quantum merit* therefore fail because the Alleged Debt does not exist and because the Trustee has failed to meet each *quantum meruit* element, and his claims for *quantum meruit* are therefore denied.

## D.    TRUSTEE'S REMAINING CLAIMS

95. To succeed on his claim for money had and received, the Trustee must prove, under Texas law, that the "defendant holds money." *Midwestern Cattle Mktg. LLC v. Legend Bank N.A.*, 800 Fed. App. 239, 246 (5th Cir. 2020). *Accord Edwards v. Mid-Continent Office Distribs. L.P.*, 252 S.W.3d 833, 837 (Tex. App. – Dallas 2008). Being owed an alleged debt is not the equivalent of actually holding money belonging to the plaintiff. *See id*. The FLP is not holding any funds belonging to MSG, G&G, or the Trustee. Accordingly, the Trustee's claims for money had and received fail as a matter of law, and are denied.

96. The Trustee's claims that the Alleged Debt exists under principles of *res judicata* are denied as a matter of law, as there is no prior judgment on the existence or validity of the Alleged Debt. *See, e.g., BVS Constr. v. Prosperity Bank (In re BVS Constr., Inc.)*, __ F.4th __, 2021 U.S. App. LEXIS 33822, *9-10 (5th Cir. Nov. 15, 2021) (quoting *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004)). MSG's scheduling of the Alleged Debt as an asset on his schedules under penalty of perjury, which itself is false, does not substitute for a final judgment on the issues.

97. The Trustee's claims that the Alleged Debt exists under principles of collateral estoppel are denied as a matter of law, as there was no prior litigation concerning the existence or validity of the Alleged Debt. *See Pace v. Bogalusa City Sch.Bd.*, 403 F.3d 272, 290 (5th Cir. 2005). MSG's scheduling of the Alleged Debt as an asset on his schedules under penalty of

perjury, which itself is false, does not substitute for a prior litigation concerning the Alleged Debt where that issue was actually litigated.

98.     The Trustee's claims that the Alleged Debt can be collected to avoid unjust enrichment are denied for substantially the same reasons as *quantum meruit*. The FLP did not receive the services or material, including advances, as alleged in the Alleged Debt, and it did not benefit from the Alleged Debt. Accordingly, the FLP did not receive a windfall and did not take advantage of MSG or G&G or commit fraud, and it was not unjustly enriched such that any restitution would be appropriate. *See Heldenfels Bros. Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) "Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant." *Id*. at 42.

99.     As the Court has denied the Trustee's breach of contract claims for the Alleged Debt, the Trustee is not entitled to any award of attorney's fees or expenses because he is not the prevailing party. *See* TEX. CIV. PRAC. & REM. CODE § 38.001; *Rohrmoos Venture v. UTSW DVA Healthcare LLP*, 578 S.W.3d 469, 486 (Tex. 2019).

**E.    PRITCHARD'S AFFIRMATIVE DEFENSES**

   **1.    Limitations**

100.     Money had and received has a two year limitations period under Texas law. *See, e.g., Payne v. Wells Fargo Bank N.A.*, 2015 U.S. Dist. LEXIS 39325 at *13-*14 (N.D. Tex. 2015); *Merry Homes Inc. v. Luc Dao*, 359 S.W.3d 881, 884 (Tex. App.—Houston 2012, no pet.)

101.     A claim for unjust enrichment is subject to a two (2) year statute of limitations. *See Elldge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 870-71 (Tex. 2007) (construing unjust enrichment as an action for the "taking . . . the personal property of another" within application of TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a)).

102. The Trustee has not pled nor proven any principle that would have tolled the above statutes of limitations.

103. Under 11 U.S.C. § 108(a)(2), limitations for the Trustee are extended for two years, but only where limitations had not expired as of the petition date.

104. Here, $453,850.00 of the Alleged Advances arise more than two years prior to the applicable petition dates, and are therefore barred by the statute of limitations with respect to both money had and received and unjust enrichment.

105. Here, the following Alleged Invoices arise more than two years prior to the applicable petition dates, and are therefore barred by the statute of limitations with respect to both money had and received and unjust enrichment: 121693, 121188, 121090, 127966, 126112, 120423, 121125, 121994, 122454, 123004, 123558, 123993, and 124565.

106. Breach of contract and *quantum meruit* each have a four (4) year statute of limitations under Texas law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(3); *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 461 (Tex. App. – Houston [1st Dist.] 2007).

107. Here, the following Alleged Invoices arise, with respect to the actual alleged services and entries rather than the date of the invoices themselves, which do not control, more than four years prior to the applicable petition dates, and are therefore barred by the statute of limitations with respect to both money had and received and unjust enrichment: 121090 and 120423. The dates of the invoices do not control because the invoices were created after-the-fact and encompass various individual alleged items, that precede the limitations period, and the theory of the case is that the resulting Alleged Debt became payable the moment the items were provided.

**2.** **<u>Estoppel</u>**

108. MSG provided the Accounting to Pritchard as part of settlement communications, which ultimately led to the Partial Settlement. As a result of the Partial Settlement, and among

other things, Pritchard and others agreed that MSG would be freed of his remaining, $250,000 secured liability for the half of the Homestead he purchased.  Pritchard also dismissed her dischargeability and discharge action against MSG under sections 523 and 727 of the Bankruptcy Code.  In these and other respects, Pritchard relied to her detriment on the Accounting.  MSG is therefore estopped, under estoppel, promissory estoppel, and quasi-estoppel from denying the representations in the Accounting that the FLP did not owe any of the Alleged Debt.

### 3.   <u>Waiver</u>

109.    Waiver is the intentional relinquishment of a known right.  Here, by not taking any action to collect on the Alleged Debt for years, and not listing the Alleged Invoices in the most recent QuickBooks files of G&G (where MSG controlled both parties to the Alleged Debts), and otherwise by not listing the Alleged Debt in any of the various documents, including the Accounting, MSG and G&G waived whatever rights they may have had to the Alleged Debts prepetition.

## F.   <u>COUNTERCLAIMS</u>

### 1.   <u>MSG's Breach of Fiduciary Duty, Self-Dealing, and Defalcation</u>

110.    As a counterclaim, Pritchard asserts that MSG committed various torts against the FLP during the time that he managed the FLP, in the nature of breaches of fiduciary duty and misappropriation and theft.

111.    To prevail on a counterclaim for breach of fiduciary duty under Texas law, Pritchard must prove: "the existence of a fiduciary duty, breach of the duty, causation, and damages."  *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App. – Houston [1st Dist.] 2003).

112.    As the sole officer and manager of the FLP, and as the manager of the FLP's general partner, MSG owed fiduciary duties to the FLP, including the duty of care, the duty of loyalty, the

duty to not self-deal, and the duty to not commit waste. *See, e.g., Gearhart Indus. v. Smith Int'l*, 741 F.2d 707 (5th Cir. 1984); *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998); *Miller v. Lucas*, 2015 Tex. App. LEXIS 5195 at * 9 (Tex. App. – Fort Worth, 2015) ("a fiduciary owes his principal a high duty of good faith, fair dealing, honest performance, and strict accountability").

113.    The duty of loyalty generally required MSG to manage the FLP and its property and businesses such that he put its interests ahead of his own and such that he did not personally profit, as the expense of the FLP. *See, e.g., Moody v. Nat'l Western Life Ins. Co.*, 634 S.W.3d 256, 275 (Tex. App. – Houston [1st Dist.] 2021). A fiduciary may profit so long as his profit is incidental to the company's, and the fiduciary may deal with the company, so long as such dealing is fair, which is subject to strict scrutiny. Where a fiduciary engages in dealing with the company, it is his burden to prove the fairness of the transaction to the company. *See, e.g., Texas Bank & Trust v. Moore*, 595 S.W.2d 502, 508-09 (Tex. 1980).

114.    The duty of care generally required MSG to handle his corporate duties with such care as an ordinarily prudent man would use under similar circumstances." *Gearhart Indus.,* 741 F.2d at 720. Generally, because business decisions are subject to the business judgment rule, violating the duty of care requires at least gross negligence. *See, e.g.*, *FDIC v. Schreiner*, 892 F. Supp. 869, 884 (W.D. Tex. 1995).

115.    MSG breached his fiduciary duties owed to the FLP for all of the reasons found above, and he misappropriated to himself various assets and property of the FLP in the nature of civil theft.

116.    Indeed, MSG's scheduling of the Alleged Debt on both his and G&G's schedules is itself a breach of the duty of loyalty, because he was still a fiduciary of the FLP at that time and he asserted false claims and debts against the FLP.

117.    MSG also breached his duty of accountability.  Among other things, he is unable to account for a large amount of the FLP's personal property in the nature of vehicles and equipment; *i.e.* the Missing Vehicles and Equipment.

118.    The Trustee has failed to demonstrate that any of MSG's self-dealing with the property of the FLP was fair to the FLP and, objectively, it was not, since the FLP received no reasonably equivalent value from MSG and MSG fraudulently transferred the FLP's property to himself.

119.    MSG's breaches of fiduciary duty and torts as described above damaged the FLP in at least the amount of $750,000.00.  It is not necessary to calculate with precision a higher amount because the damage that MSG caused is more than any realistic distribution that MSG or his estate may receive from the liquidation of the FLP.

120.    MSG's breaches of fiduciary duty give rise to various forms of damages under Texas law.  For one, he is liable for monetary damages.  In this respect, Pritchard seeks to setoff against sums that the FLP may distribute to MSG or his estate upon the liquidation of the FLP against the damages that MSG's breaches of fiduciary duty caused the FLP.

121.    Texas recognizes the right of setoff.  *See Bandy v. First State Bank*, 835 S.W.2d 609, 618 (Tex. 1992).  Here, upon its liquidation, the FLP will owe MSG a portion of the proceeds remaining.  MSG owes the FLP for his breaches of fiduciary duty.  The question of mutuality— whether the debts are mutual between the same parties—is a difficult one to assess under Texas law due to the trusts being the actual equity owners of the FLP.  However, there is mutuality between the Trustee and the FLP, and that is what matters for purposes of the mutual claims, for the setoff right is measured as of now and not as of some prior time.

122.    Namely, the MSG estate owes the FLP damages for MSG's prepetition breaches of fiduciary duty, even though the Claims Order makes clear that that claim cannot be recovered as a

monetary claim, but may be recovered under setoff. The FLP, upon its distribution, will owe the MSG estate resulting proceeds. This is because, whether MSG owned an interest in the FLP directly, or through one or more trusts, is immaterial: all of the same became property of his estate under the administration of the Trustee, and it is his estate, and therefore the Trustee, that will be owed the payment. So, how it gets to the Trustee is immaterial: it will get to the Trustee, for the estate, if there is anything to pay. There is therefore mutuality.

123.    And, it is immaterial that MSG has received a discharge or that the FLP's claims against his estate have been disallowed. The discharge does not prevent a setoff, and the Claims order expressly provides that "the disallowance of the Subject Claim is not a substantive determination of its merits and is without prejudice as to any other matter other than a distribution or payment from the Estate." Pritchard, of course, is not seeking a distribution or payment from the MSG estate.

124.    The Trustee's remaining arguments that the FLP cannot effectuate a setoff is wrong. First, it is not a setoff against G&G. MSG, and not G&G, owed the fiduciary duties to the FLP that MSG breached, and it is MSG, not G&G, that is entitled to any proceeds upon the final liquidation of the FLP. Second, this claim was expressly preserved in the Claims Order. Third, there is no prohibition under Texas law against setting off a debt against an equity interest; rather, it is the setting off of one obligation against another, and both are "obligations." Fourth, now that the FLP is being liquidated, MSG's and his estate's interests are converted from equity interests into claims, in that MSG and his estate have a claim; *i.e.* a right to payment, from the liquidating FLP.

125.    Accordingly, because there is a mutuality of obligations, and because the Claims Order is not a decision on the merits and is without prejudice to the issue of setoff, the Court concludes that whatever recovery the MSG estate may have from the liquidation of the FLP shall

be setoff in full for the MSG estate's liability to the FLP on account of MSG's torts, in at least the amount of $750,000.00 (representing the MSG estate's share and not the whole of the funds that may be available for distribution).

126. Pritchard also seeks to forfeit MSG's and his estates share of the proceeds of the liquidation of the FLP. Equitable forfeiture is a remedy available under Texas law for a breach of fiduciary duty, when the breach is "clear and serious." *See, e.g., Swinnea v. ERI Consulting Eng'rs Inc.*, 481 S.W.3d 747, 753 (Tex. App. – Tyler, 2016). *See also Cooper v. Sanders H./Richard T. Mullen Inc.*, 2016 Tex. App. LEXIS 9253 at * 31 (Tex. App. – Dallas, 2016). Actual damages need not be proven for equitable forfeiture. *See ERI Consulting Eng'rs Inc. v. Swienna*, 318 S.W.3d 867, 874 (Tex. 2010). The remedy of constructive trust is also available for a breach of fiduciary duty. *See, e.g., Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974).

127. MSG's breaches of fiduciary duty to the FLP are "clear and serious." Nothing can be more clear or serious than taking his principal's properties and funds to himself and for his benefit, with no return consideration to the FLP. It is misappropriation and theft, and no breach of fiduciary duty can be clearer or more serious than that. Likewise with respect to lowering the royalty price paid at the FLP's rock quarry literally days or weeks after the father died, which was clearly done to profit at the expense of the FLP and was well below market, even judging by what MSG paid at other rock quarries he used.

128. While equitable forfeiture and constructive trust are usually limited to the profits of the breach of fiduciary duty, this is not a limitation. *See, e.g., ERI Consulting*, 318 S.W.3d at 873 ("courts may fashion equitable remedies such as . . ."). Here, because MSG has received a discharge, and because he no longer has the fruits of his torts to account with or to disgorge, the only remaining equitable remedy is that he and his estate not recover any distribution from the

very entity that he committed those torts against; *i.e.* that neither he nor the estate share in any remaining proceeds upon the liquidation of the FLP.

129.    It would be highly inequitable to permit MSG, and therefore his estate, to share equally with his siblings in the distribution of those proceeds when he has for years taken more than his share from the FLP at the expense of his siblings, who are equal indirect interest holders with him.  In effect, he has "prepaid" himself any entitlement to proceeds, and, under principles of restitution, equitable equalization, and equitable reallocation, the Court will deem that MSG and therefore his estate have already been paid more than their fair share of the value of the FLP such that all value that remains will be split between the remaining indirect interest holders to the exclusion of MSG and his estate.

130.    The Court finds further support for this equitable forfeiture in section 6.1 of the FLP Agreement, which requires that any distribution from the FLP be "pro rata" to the partners in the FLP.  And, section 11.4(b) of the FLP Agreement requires that any funds paid upon a liquidation be paid "to the Partners in the amount equal to the credit balances in their capital accounts."  MSG, by taking out money and property of the FLP and not sharing it pro-rata with the others, altered his indirect capital account such that there is a different balance, and such that the other partners need to be paid first before the MSG capital account will share, in order that sections 6.1 and 11.4(b), in addition to equity, be properly served.

131.    The Court may not order both monetary damages and equitable relief if doing so would constitute a double recovery.  Here, awarding both a setoff and an equitable forfeiture would award a double recovery, but the end result is the same because the Court cannot award monetary damages against MSG's estate or MSG personally.  Thus, the only remaining remedy is that MSG and his estate will not be paid on account of their equity interests in the FLP, whether doing so is under theories of setoff or under theories of equitable forfeiture.

2. **Attorney's Fees**

132. The Trustee sued the FLP to collect on alleged oral contracts. The Court has denied the Trustee all relief, and Pritchard is the prevailing party. The prevailing party in an action for breach of an oral contract is entitled to its reasonable attorney's fees and expenses. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(b)(8); TEX. CIV. PRAC. & REM. CODE ANN. § 134.005(b). Prichard, as the prevailing party, is entitled to those fees and expenses even though she does not recover any monetary damages against the Trustee. *See, e.g., Rohrmoos Venture v. UTSW DVA Healthcare LLP*, 578 S.W.3d 469, 486 (Tex. 2019); *Essex Crane Rental Corp. v. Striland Constr. Co.*, 753 S.W.2d 751, 758 (Tex. App. – Dallas, 1988) (holding that defendant who successfully prosecutes a counterclaim within the operation of the statute is entitled to attorney's fees). *See also* TEX. CIV. PRAC. & REM. CODE ANN. § 38.005 (requiring liberal construction of the statute).

133. Here, Pritchard prevailed on the Trustee's contract claims. She also prevailed on her claims that, in breaching his duties to the FLP, SMG breached the limited partnership agreement of the FLP. And, insofar as Pritchard proved that SMG committed civil theft against the FLP, she is separately entitled to an award of reasonable attorney's fees and expenses under the Texas Civil Theft Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134.002 (defining "theft" as "unlawfully appropriating property"); TEX. PENAL CODE ANN. § 31.03(a) ("[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property").

134. Pritchard did not waive or release any attorney's fees claims in the Claims Order. That order disallowed Pritchard's claims in the bankruptcy case, but: (i) a postpetition claim for attorney's fees is not a "claim"; and (ii) Pritchard did not assert, in her proof of claim that was disallowed, any claim for attorney's fees in this Adversary Proceeding.

135. Pursuant to Rule 54(d), all matters regarding the quantification of Pritchard's reasonable attorney's fees and expenses will be considered pursuant to motion practice, at such time and upon such procedure as is otherwise appropriate.

RESPECTFULLY SUBMITTED this 9th day of February, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Thomas D. Berghman, Esq.
     Texas Bar No. 24082683
     3800 Ross Tower
     500 North Akard St.
     Dallas, Texas 75201
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375

**ATTORNEYS FOR LESLIE PRITCHARD**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 9th day of February, 2022, true and correct copies of this document were served upon Kent Ries, Esq. via e-mail through the Court's ECF system.

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.